**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

No. 92-9096

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

VERSUS

WILLIE HUGH MORRIS, BRENDA PEARL OWENS, ERNEST MUNOZ, A/K/A
ERNESTO, KENNETH LEON MORRIS

Defendants-Appellants.

**CONSOLIDATED**

No. 92-9110

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

VERSUS

CHARLES BERNARD MALONE, A/K/A TUNA,

Defendant-Appellant.

Appeals from the United States District Court
for the Northern District of Texas

(February 16, 1995)

Before KING and BENAVIDES, Circuit Judges, and LEE*, District Judge.


BENAVIDES, Circuit Judge:

These appeals concern five members of two of a number of organizations involved in a major cocaine trafficking scheme. Defendants-Appellants Willie Morris, Kenneth Morris, Brenda Owens ("Owens"), Ernesto Munoz ("Munoz"), and Charles Malone ("Malone") were each convicted of conspiracy to possess with intent to distribute and to distribute cocaine in violation of 21 U.S.C. § 846. Willie Morris was also convicted of money laundering in violation of 18 U.S.C. § 1956; possession with intent to distribute cocaine in violation of 21 U.S.C. § 841(a)(1) and 21 U.S.C. § 841(b)(1)(A); and aiding and abetting others in committing money laundering and possession with intent to distribute cocaine in violation of 18 U.S.C. § 2. In addition to the conspiracy conviction, Owens was also convicted of possession with intent to distribute cocaine in violation of 21 U.S.C. § 841(a)(1), while Munoz was also convicted of distribution of cocaine in violation of 21 U.S.C. § 841(a)(1). Finally, Kenneth Morris and Malone were also convicted of money laundering in violation of 18 U.S.C. § 1956. They separately raise numerous issues on appeal. Finding no reversible error, we affirm.

---

*District Judge of the Southern District of Mississippi, sitting by designation.

## FACTS AND PROCEDURAL HISTORY

On January 30, 1992, a thirty-five count indictment was returned against twenty-three individuals, including Willie Morris, Kenneth Morris, Owens, Munoz, and Malone. The appellants were charged with several drug offenses, including a charge of conspiracy to commit the substantive drug offenses from on or about May 1, 1989 to November 7, 1991.

At trial, the government relied heavily on the testimony of Victor Mattias Costa ("Costa"), a cocaine "broker" or "distributor" in the Fort Worth, Texas area. Costa testified that he bought bulk quantities of cocaine from several different groups of suppliers and sold the cocaine to a number of drug organizations in the Fort Worth area. The suppliers included: (1) several groups from Miami, Florida; (2) Munoz and his associates ("Munoz Organization"); and (3) a group from Laredo, Texas ("Laredo Organization"). The purchasers included: (1) a group that included Willie Morris, Kenneth Morris, Owens, and Malone ("Morris Organization"); (2) the Ronald Jerome Fisher organization ("Fisher Organization"); and (3) a group from Atlanta, Georgia. On July 21, 1992, the district court severed the trial into two groups of defendants. The Morris and Munoz Organizations were tried together, while the Fisher Organization was tried separately with the Laredo Organization.

The jury returned verdicts against each of the appellants. The arguments of each appellant and the disposition thereof will be considered separately as follows:

## I.    Ernesto Munoz

**A.    Was there a material variance between the indictment and the government's proof at trial that harmed Munoz?**

Munoz claims that his conviction should be reversed because a fatal variance existed between the indictment, which charged a single conspiracy, and the proof at trial, which revealed multiple conspiracies.  Even if a variance existed, however, Munoz must still prove that his substantial rights were violated.  "The true inquiry is not whether there has been a variance in proof, but whether there has been such a variance as to `affect the substantial rights' of the accused." Berger v. U.S., 295 U.S. 78, 82 (1935).  Thus, in order to prevail, Munoz must prove (1) a variance between the indictment and the proof at trial; and (2) that the variance affected his "substantial rights."

### i.  Variance

To prove a conspiracy, the government must prove (1) the existence of an agreement between two or more persons to violate the narcotics laws; (2) that each conspirator knew of the conspiracy and intended to join it; and (3) that each alleged

-4-

conspirator participated in the conspiracy.  U.S. v. Maseratti, 1 F.3d 330, 337 (5th Cir. 1993), *cert. denied*, -- U.S. --, 114 S. Ct. 1096 (1994).  To determine whether a variance existed between the indictment and the proof at trial, the number of conspiracies proved at trial must be counted.  The principal considerations in counting conspiracies are (1) the existence of a common goal; (2) the nature of the scheme; and (3) the overlapping of the participants in the various dealings.  U.S. v. Richerson, 833 F.2d 1147, 1153 (5th Cir. 1987).  In examining these factors, "[w]e must affirm the jury's finding that the government proved a single conspiracy unless the evidence and all reasonable inferences, examined in the light most favorable to the government, would preclude reasonable jurors from finding a single conspiracy beyond a reasonable doubt."  U.S. v. DeVarona, 872 F.2d 114, 118 (5th Cir. 1989).

*1.  A common goal*.  Everyone alleged to be part of the same single conspiracy must share a common goal.  "Where the evidence demonstrates that all of the alleged co-conspirators directed their efforts towards the accomplishment of a single goal or common purpose, then a single conspiracy exists."  Id.  The Fifth Circuit has broadly defined this criterion and has adopted an expansive notion of a "common purpose."  For example, we have found a common purpose with a plan to purchase cocaine involving various participants over three years, U.S. v. Rodriguez, 509 F.2d 1342, 1348 (5th Cir. 1975), and in a series of staged automobile accidents involving different participants, in different locations,

and over an extended period of time, U.S. v. Perez, 489 F.2d 51, 62-63 (5th Cir. 1973), *cert. denied*, 417 U.S. 945, 94 S. Ct. 3067 (1974).  In fact, one panel has remarked that "[g]iven these broad `common goals' the common objective test may have become a mere matter of semantics."  Richerson, 833 F.2d at 1153.

In the instant case, the common goal is readily apparent.  The common goal of everyone involved, the suppliers, Costa, and the purchasers, was to derive personal gain from the illicit business of buying and selling cocaine.  The sellers, such as Munoz, derived profits from selling to the middleman, Costa, at a higher price than for what they had bought.  The purchasers, such as Willie Morris, derived profits from selling at a higher price than for what they had bought from Costa.  Likewise, Costa derived profits from selling to the purchasers at a higher price than for what he had bought from the sellers.  The overall objective or goal was for everyone in the conspiracy to profit from the illicit purchase and selling of cocaine.

*2. The nature of the scheme*.  Although diagrams and charts of conspiracies as either "wheels" or "chains" were once important in analyzing this criterion,[1] this court has moved away from a

---

[1]See, e.g., U.S. v. Elliott, 571 F.2d 880, 900 (5th Cir. 1978) ("The essential element of a chain conspiracy--allowing persons unknown to each other and never before in contact to be jointly prosecuted as co-conspirators--is interdependence.  The scheme which is the object of the conspiracy must depend on the successful operation of each link in the chain."), *cert. denied*, 439 U.S. 953, 99 S. Ct. 349 (1978); U.S. v. Levine, 546 F.2d 658, 663 (5th Cir. 1977) ("If there is not some interaction between those conspirators who form the spokes of the wheel as to at least one common illegal object, the `wheel' is incomplete, and two conspiracies rather than one are charged.").

structural and formal examination of the criminal enterprise. Indeed, we have rejected an analysis of this factor based on wheels, charts, or other modes.[2] Instead, this court has moved to a more functional and substantive analysis. In 1973, we determined that, "[i]f [an] agreement contemplates bringing to pass a continuous result that will not continue without the continuous cooperation of the conspirators to keep it up, then such agreement constitutes a single conspiracy." Perez, 489 F.2d at 62. Similarly, in U.S. v. Elam, 678 F.2d 1234 (5th Cir. 1982), we stated that the existence of a single conspiracy will be inferred where the activities of one aspect of the scheme are necessary or advantageous to the success of another aspect or to the overall success of the venture, where there are several parts inherent in a larger common plan, id. at 1246.

Thus, it can be said in the instant case that "[t]he success of this conspiracy depended on the continued willingness of each member to perform his function." Richerson, 833 F.2d at 1154. If the sellers discontinued selling, there would be no cocaine for Costa and the purchasers to buy. "The necessity of a steady

---

[2]Finding that they impede rather than facilitate analysis of the "single conspiracy-multiple conspiracy" issue, we eschew utilization of figurative analogies such as "wheels," "rims" and "hubs," which are often used to describe the nature of complex conspiracies. We reiterate Judge Brown's comment in *United States v. Perez*, 489 F.2d 51 (5th Cir. 1973), that "[c]onspiracies are as complex as the versatility of human nature and federal protection against them is not to be measured by spokes, hubs, wheels, rims, chains or any one or all of today's galaxy of mechanical molecular or atomic forms." 489 F.2d at 59, n.11. The government is not required to attempt to squeeze conspiracy into any particular mold.
U.S. v. Elam, 678 F.2d 1234, 1246 (5th Cir. 1982).

cocaine supply to feed a distribution effort is beyond question."
DeVarona, 872 F.2d at 199. Likewise, the distribution effort is
critical to the success of the suppliers. If the purchasers ceased
to buy, there would be no reason for Costa to buy from the sellers,
and hence no reason for the sellers to acquire the cocaine. Thus,
although the sellers and the purchasers may not have had a direct
relationship with each other, each was necessary for the continued
success of the venture.

Munoz suggests that an analysis of the conspiracy horizontally
among the suppliers and the purchasers, however, points to a
different conclusion. Munoz, for example, argues that his
organization could not have been in the same conspiracy as the
other suppliers, such as the Laredo Organization, which were
competitors. Munoz cites to the testimony of Costa in which he
stated that he initially approached the Laredo Organization for
cocaine after becoming unhappy with Munoz. Likewise, it is
suggested that the Morris Organization cannot be in the same
conspiracy as the other purchasers, such as the Fisher
Organization, which were their competitors.

We are not persuaded by this argument. We keep in mind that
the larger, common plan was the purchase and sale of drugs through
Costa for profit. Munoz is no less a part of this larger, common
plan because Costa also purchased from others. To illustrate, if
one manufactures parts to be used in producing automobiles and
indeed sells these parts to be used in the production of such
vehicles, one's activities in so producing and selling these parts

and enabling the automobiles to be made may be seen as necessary to the overall success of the production of the vehicles. The larger, common plan has been advanced. Two larger, common plans are not created if the auto maker buys some of a competitor's parts. Indeed, such purchases may in fact be necessary from time to time to keep the larger, common plan in existence. Similarly, we believe that a separate conspiracy was not created because from time to time Costa used other sellers or purchasers to keep the scheme alive.

*3. Overlapping of participants in the various dealings*. This final criterion examines the interrelationships among the various participants in the conspiracy. The more interconnected the various relationships are, the more likely there is a single conspiracy. Munoz argues that there were no interrelationships, as he did not know or deal with anyone in the conspiracy other than Costa. However, "[t]here is no requirement that every member must participate in every transaction to find a single conspiracy. Parties who knowingly participate with core conspirators to achieve a common goal may be members of an overall conspiracy." Richerson, 833 F.2d at 1154 (footnote omitted). This court continued:

> A single conspiracy exists where a "key man" is involved in and directs illegal activities, while various combinations of other participants exert individual efforts toward a common goal. *Elam*, 678 F.2d at 1246. . . . The members of a conspiracy which functions through a division of labor need not have an awareness of the existence of the other members, or be privy to the details of each aspect of the conspiracy. *Elam*, 678 F.2d at 1246.

Richerson, 833 F.2d at 1154. Here, the "key man" was Costa. The government does not have to establish that the sellers and purchasers knew each other or knew what each was doing. All that the government needs to show is that the sellers and purchasers were conspiring with Costa to transact illicit business in cocaine. Such activities were amply demonstrated by the testimony and evidence presented at trial. The bulk transfers of cocaine by Munoz to Costa show obvious efforts on the part of Munoz to facilitate the cocaine trafficking scheme. And the amounts transferred themselves evince a knowledge that such cocaine would be sold or delivered to other parties. In addition, evidence that Munoz was involved in the decision rejecting a drop-off location where 200 kilograms of cocaine were to be delivered because the location was unfeasible and his involvement in suggestions for a safe place at which Costa could receive and deliver 200 to 300 kilograms of cocaine show his awareness of the agreement to provide cocaine so that Costa could deliver to other participants in the conspiracy.

Accordingly, after considering the three factors, we find no variance between the proof at trial and the indictment.[3]

_____

[3]Munoz cites U.S. v. Townsend, 924 F.2d 1385 (7th Cir. 1991), as a case with analogous facts to the instant one in which the court held that a single conspiracy did not exist. Townsend is not controlling in this circuit, and Munoz presents no arguments or reasoning outside of the arguments advanced in Townsend as to why we should reject established Fifth Circuit precedent. We note, in addition, that the error found by the Townsend court was not reversible error. Id. at 1410.

ii.  Prejudice to Substantial Rights


Even assuming a variance between the indictment and the proof
at trial, no reversible error occurs unless Munoz' substantial
rights were prejudiced.  Richerson, 833 F.2d at 1155.  Munoz argues
that testimony involving the other conspiracies in which he was not
involved in were allowed at trial and that this evidence prejudiced
him.  Munoz cites to the testimony and evidence concerning the
Fisher Organization, Morris Organization, and Laredo Organization.
In particular, Munoz argues that, because the testimony on the
Fisher Organization involved crack cocaine, which the Munoz and
Morris Organizations did not deal in, the potent stigma related to
that form of cocaine was especially prejudicial.

The possible transference of guilt to Munoz from the evidence
concerning the Fisher and Laredo Organizations is a danger that the
variance doctrine was meant to protect against.  "The most common
prejudice to a substantial right resulting from a variance is
transference of guilt.  Courts have recognized their duty to
protect those tried en masse on a conspiracy count from possible
transference of guilt from other joint defendants."  Richerson, 833
F.2d at 1155.  Munoz specifically points to the introduction of
cocaine seized from Costa's couriers before Costa had even met
Munoz.  Munoz also emphasizes the fact that the lower court gave an
instruction pursuant to Pinkerton v. U.S., 328 U.S. 640 (1946), in

-11-

which the Court held that an act of one conspirator is attributable to all in the conspiracy, id. at 647.  At oral argument, Munoz contended that the Pinkerton instruction increased the possibility of guilt transference, as the jury may have attributed the acts of the other conspiracies to him pursuant to this instruction.  We must reject this claim.

We have held "that where the indictment alleges a single conspiracy and the evidence established each defendant's participation in at least one conspiracy a defendant's substantial rights are affected only if the defendant can establish reversible error under general principles of joinder and severance." U.S. v. Jensen, No. 93-1126, slip op. 1526, 1538 (5th Cir. Dec. 20, 1994) (quoting U.S. v. Faulkner, 17 F.3d 745, 762 (5th Cir.), *cert. denied*, 115 S. Ct. 193 (1994)).  Here, the evidence clearly establishes every defendant's participation in at least one conspiracy.  Munoz has not demonstrated improper joinder and severance, as the Fisher and Laredo Organizations were severed and tried separately.  Thus, Munoz' substantial rights have not been violated.

Further, in U.S. v. Guerra-Marez, 928 F.2d 665 (5th Cir.), *cert. denied*, 112 S. Ct. 322 (1991), a panel of this Circuit held that the trial judge's instructions safeguarded against the possibility of guilt transference, id. at 672.  Here, the trial court gave an instruction very similar to the one given in Guerra-Marez.  In Guerra-Marez, the trial judge stated:

If you find that a particular defendant is a member of another conspiracy, not the one charged in the

-12-

indictment, then you must acquit the defendant. In other words, if you find the defendant guilty of the conspiracy offense alleged in count 1, you must find that he or she was a member of the conspiracy alleged in count 1 and not some other, different conspiracy.

Id. at 672 n.7. Here, the lower court stated:

> You must determine whether the conspiracy charged in the indictment existed, and, if it did, whether the defendant was a member of it. If you find that the conspiracy charged does not exist, then you must return a not guilty verdict, even though you find that some other conspiracy existed. If you find that a defendant was not a member of the conspiracy charged in the indictment, then you must find that defendant not guilty, even though that defendant may have been a member of some other conspiracy.

In deciding that the instruction was sufficient protection against guilt transference, the Guerra-Marez court emphasized the fact that the risk of guilt transference was minimal because only two conspiracies were proved at trial. Id. at 672. Here, assuming that four conspiracies, as suggested by Munoz, were involved (Munoz-Costa-Morris, Munoz-Costa-Fisher, Laredo-Costa-Morris, Laredo-Costa-Fisher), only one of the combinations was the focus of the trial because of the severance ordered by the trial court. In Guerra-Marez, there was no such separation. Also, in the several instances in which testimony on crack cocaine was allowed, the trial court issued a cautionary instruction to the jury, stating that the testimony was not to be considered for the guilt of the defendants. Munoz' substantial rights were not prejudiced.

**B. Should Munoz' proposed addition to the jury instruction have been given?**

At trial, as part of his objection to the jury charge, Munoz sought to have an addition to pattern jury instruction 1.19, the "on or about" instruction.  Jury instruction 1.19 states:

> You will note that the indictment charges that the offense was committed on or about a specified date.  The government does not have to prove that the crime was committed on that exact date, so long as the government proves beyond a reasonable doubt that the defendant committed the crime on a date reasonably near _____ [repeat date], the date stated in the indictment.

Munoz proposed the following addition:

> This is not to say, however, that the testimony of a witness cannot be evaluated or discredited by evidence that an incident occurred on a date different from that testified to by the witness, if it occurred at all.

Munoz argues that this additional instruction was necessary to protect his rights.  Munoz points to the fact that, at trial, there were numerous instances in which there were discrepancies in dates stated in the witnesses' testimony and hotel records.  For example, in testifying about the execution of one cocaine transaction, Costa stated that one of Munoz' associates had checked into a hotel on December 19, 1990, when the hotel records revealed that the associate did not check in until December 20.  Munoz argues that, although Munoz attempted to highlight these discrepancies during closing argument and cross-examination, because the proposed addition was not read to the jury, the jury did not know that it could consider the discrepancies when assessing the credibility of the witnesses.

When a trial court refuses to give a requested instruction, the appellate court must review the refusal under an abuse of discretion standard.  U.S. v. Sellers, 926 F.2d 410, 414 (5th Cir.

-14-

1991). "The trial judge is given substantial latitude in tailoring the instructions so long as they fairly and adequately cover the issues presented." U.S. v. Pool, 660 F.2d 547, 558 (5th Cir. 1981). The refusal is reversible error only if the proposed instruction (1) is substantively correct; (2) was not substantially covered in the charge actually delivered to the jury; and (3) concerns an important point in the trial so that the failure to give it seriously impaired the defendant's ability to effectively present a given defense. U.S. v. Grissom, 645 F.2d 461, 464 (5th Cir. 1981).

Here, the second criterion has not been met. The trial judge not only gave pattern jury instruction 1.09 (credibility of witnesses), but also gave pattern jury instructions 1.15 (accomplice-informer-immunity) and 1.16 (accomplice-codefendant-plea agreement), all of which touched upon the jury's ability to assess the credibility of witnesses. The court's instruction correctly informed and allowed the jury to take such discrepancies into account.

Munoz also claims that the "on or about" jury instructions by themselves lessened the burden of proof of the government as they improperly led the jury to believe that it could automatically excuse these discrepancies. We find no merit in such argument. While the "on or about" instruction relieves the government from absolute accuracy with respect to the dates in its pleadings, the government must still prove beyond a reasonable doubt the

commission of the crime on a date reasonably near the date stated in the indictment.

## C. Should Munoz' base offense level have been increased by three levels for the purpose of sentencing?

At sentencing, the district court found Munoz to be a manager or supervisor and accordingly ruled that a three-level increase for an adjustment for role in the offense under § 3B1.1(b) of the 1992 United States Sentencing Guidelines ("Guidelines") was justified for Munoz. Section 3B1.1(b) states: "If the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by 3 levels." Munoz contends that his relationship with Costa was only as a seller in a buy-sell relationship.

In reviewing a trial court decision on sentencing, we will not disturb the district court's findings on a sentencing factor unless the findings are clearly erroneous. U.S. v. Whitlow, 979 F.2d 1008, 1011 (5th Cir. 1992). As long as it is plausible in light of the record read as a whole, a factual finding is not clearly erroneous. Id.

The trial court's findings are plausible in light of the record as a whole. To illustrate, at trial Costa testified that, during one of the times that cocaine was transferred to Costa from Munoz, Munoz was the individual giving the orders on the place of transfer and the method of transfer. Costa also testified that,

-16-

when he was first introduced to Munoz, he was told that Munoz was the man he would be contacting for his Texas business. Costa testified that, when he became late on his payments, Munoz led the group that threatened his life. And finally, when one of Munoz' associates, Felix Machado, grabbed Costa as if he was going to start a fight, Munoz told Machado that the place was not appropriate for such action, and no fight ensued. The district court's finding that Munoz was a manager or supervisor in the conspiracy is supported by the record, plausible, and not clearly erroneous.

## II. Willie Hugh Morris

### A. Did the district court err in rejecting Morris' motion to suppress?

Willie Morris argues that certain evidence allowed by the district court at trial was obtained as a result of an illegal search and seizure in violation of the Fourth Amendment. Specifically, he complains of the seizure at his residence by federal agents of a business card of Costa bearing Costa's address. The pertinent facts reveal that state police officers searched Willie Morris' residence for a gun pursuant to a search warrant that was obtained in connection to a murder investigation. In conducting the search, the state officers came upon legal documents concerning Willie Morris' ownership of several automobiles and real property, travel tickets, and other financial records, including

possibly ledgers, the existence of which they told federal officers. The federal officers used this information to obtain a search warrant for Willie Morris' residence.

Willie Morris argues that, because the state officers stepped outside the bounds of the initial warrant in examining the pieces of evidence, which were not related at all to the gun they were searching for, the Fourth Amendment was violated. He contends that, because the warrant that the federal officers used was based on evidence obtained from an illegal search and seizure, this second warrant cannot be valid.

But even assuming there was no probable cause for a search, the evidence may still be admissible under the "good faith" exception to the exclusionary rule, whereby the rule will not apply when the evidence has been obtained by objectively reasonable reliance on a subsequently invalidated search warrant. U.S. v. Leon, 468 U.S. 897, 922-23 (1984). As we held in the previous action on this issue, U.S. v. Kim Banks & Willie Hugh Morris, No. 91-7013 (Nov. 19, 1992), the warrant is not so lacking in probable cause as to render official belief in the existence of probable cause unreasonable because other information, not connected to the state officers' illegal search, existed to justify the warrant. For example, the affidavit contained information that Willie Morris discussed drug transactions in his home and that he was involved in the illicit cocaine business. Such information by itself would make official belief in the existence of probable cause reasonable. Because Willie Morris has not demonstrated any difference in the

facts or law since this court last considered this matter, we again reject his Fourth Amendment claim.

**B.  Did the use of certain evidence violate the double jeopardy clause?**

Willie Morris contends that, because 10,000 gelatin capsules allegedly used to package cocaine had been introduced previously by the government to obtain a prior conviction of Willie Morris, the use of this same evidence in the instant trial violates the Double Jeopardy Clause of the Fifth Amendment.

But Willie Morris does not contend that the previous offense was the same offense, a lesser included offense, or that this subsequent prosecution fails the Blockburger test.  Blockburger v. U.S., 284 U.S. 299, 304 (1932).  And since the previous prosecution resulted in a conviction, he cannot nor does he attempt to argue that the previous decision predetermined in his favor an ultimate and essential issue in the subsequent prosecution.  See Ashe v. Swenson, 397 U.S. 436, 443-46 (1970).  Appellant's Double Jeopardy claim is without merit.  The Fifth Amendment bars a subsequent prosecution and punishment for the same offense; it does not bar admission of the same evidence.

### III.  Brenda Pearl Owens

**A.  Was the evidence sufficient to support a conviction?**

Owens argues that her conspiracy conviction should be vacated because of insufficient evidence. Owens claims that there was no evidence that she knew of the essential nature of the conspiracy, that she was a member of the Morris Organization, and that she knew of anyone who was a part of the conspiracy. In conducting a review of the sufficiency of the evidence, we consider the evidence in the light most favorable to the government, with all reasonable inferences and credibility choices made in support of the jury's verdict. If a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt, we must affirm. U.S. v. Yamin, 868 F.2d 130, 133 (5th Cir.), *cert. denied*, 492 U.S. 924, 109 S. Ct. 3258 (1989).

In order to obtain a narcotics conspiracy conviction, the government must prove beyond a reasonable doubt (1) that an agreement to violate the narcotics laws existed between two or more persons; (2) that each alleged conspirator knew of the conspiracy and intended to join it; and (3) that each alleged conspirator participated in the conspiracy. Maseratti, 1 F.3d at 337. An overt act does not need to be shown. The "agreement between the co-conspirators and the defendant need not be proved by direct evidence, but may be inferred from concert of action." U.S. v. Vergara, 687 F.2d 57, 60-61 (5th Cir. 1982). "Such action may be inferred from the circumstances as a whole. Acts which are not per se unlawful lose that character when cumulatively viewed as the constituent elements of a criminal conspiracy." U.S. v. Medina, 887 F.2d 528, 530 (5th Cir. 1989) (citing U.S. v. Muller, 550 F.2d

-20-

1375, 1380 (5th Cir.), *cert. denied*, 434 U.S. 971, 98 S. Ct. 522 (1977)).

The record reveals that Owens once brought the down payment money for a cocaine distribution to Costa and that she had told Costa that she was from Willie Morris. Further, when the plans for a cocaine delivery were being arranged, Costa, Willie Morris, and Owens were on a three-way line, and Owens herself was the person who arrived to pick up the cocaine. Owens' house was also a place of storage and capping for the cocaine. A rational jury could easily find the elements of the conspiracy charge beyond a reasonable doubt.

**B.  Was there a material variance between the indictment and the government's proof at trial that harmed Owens?**

Owens argues that she was prejudiced by a material variance between the indictment and the government's proof at trial. She adopts the argument advanced by Munoz. Owens was on the purchasing side of Costa's cocaine dealing operation. For the same reasons as set out in disposing of Munoz' argument, we likewise reject the argument of Owens.

## IV.  Kenneth Leon Morris

**A.  Was the evidence sufficient to support a conviction?**

Kenneth Morris argues that there is insufficient evidence to support his conspiracy conviction. According to Kenneth Morris, there is no testimony or evidence that (1) any discussions relating to narcotics deals was ever conducted in the presence of Kenneth Morris; (2) that Kenneth Morris knew of the nature of the conspiracy (that the money he was delivering was for cocaine shipments, as opposed to money from gambling or prostitution or some other form of illegal activity); and (3) that narcotics activities, such as capping, occurred in the presence of Kenneth Morris. He admits that he was present when money was given to Costa, but points out that he was not present when the cocaine was actually delivered to Willie Morris. We reject Kenneth Morris' insufficiency claim.

The evidence reviewed in the light most favorable to the jury verdict reveals that Kenneth Morris delivered large sums of money to Costa on a number of occasions. For example, Costa testified that, in May 1989, Kenneth Morris delivered a suitcase containing around $110,000. On another occasion, Kenneth Morris handed a bag to Costa containing $180,000. Costa testified that the money was in payment of cocaine deliveries to the Morris Organization. Further, DEA agents investigating Kenneth Morris' house discovered bags of money located at various points throughout his residence. Anderson testified that these bundles of cash were like the bundles of cash that would be put together when Willie Morris was counting drug proceeds. The agents also found an electric money counting machine and a piece of paper with co-conspirator Charles Malone's

nickname, "Tuna," and business telephone number printed on it. The agents also found several pieces of paper with numbers and letters broken into columns. A DEA agent testified that the numbers may refer to dollar amounts and weight amounts of narcotics. Clearly, Kenneth Morris knowingly possessed on more than one occasion large quantities of cash which he delivered in payment for cocaine and from which the jury could reasonably infer that he knew the object of the conspiracy.

Kenneth Morris contends that, in cases where a challenge to the sufficiency of evidence has been overruled, there was always evidence of narcotics activity taking place in the presence of the defendant. However, in U.S. v. Gallo, 927 F.2d 815 (5th Cir. 1991), we held that the defendant's "knowing possession of [$300,000], which represented a necessary part of the conspiracy," made it "reasonable for the jury to conclude that [the defendant] knew the object of the conspiracy". Id. at 821. In Gallo we recognized that drug traffickers are unlikely to entrust a large portion of the proceeds from their illicit trade to an outsider, especially so when one entrusted with such proceeds is aware of the valuable nature of the merchandise that he is transporting. Because of the repeated payments of large amounts of cash for cocaine and the clandestine nature of the exchanges that Kenneth Morris was involved in, the jury could easily conclude that Kenneth Morris acted as the "banker" for the conspiracy, just as the defendant in Gallo.

-23-

Aware of our decision in <u>Gallo</u>, Kenneth Morris seeks to distinguish this case by arguing that there is evidence that Willie Morris purposely did not include Kenneth Morris as part of the conspiracy. For example, one government witness, Bobby Anderson, testified that Willie Morris specifically told him not to discuss narcotics around Kenneth Morris and not to mix the narcotics business with his family, and that Willie Morris was very sensitive about his family's knowledge of his drug activities. Further, another government witness, Costa, testified that he was chided by Willie Morris for once leaving a note for Willie Morris at Kenneth Morris' house. Kenneth Morris contends that the evidence establishes that Willie Morris did not want to involve Kenneth Morris in the drug trade, but rather intended to use him as his personal helper on money matters. Kenneth Morris continues by arguing that, in <u>Gallo</u>, there was no evidence or testimony from government witnesses that the defendant was actively being shielded from the conspiracy. We reject this argument because the testimony of the shielding given by Anderson and Costa could very well have been disregarded by the jury. Moreover, it is also quite possible that the jury interpreted the shielding as an attempt by Willie Morris to shield his brother from prosecution or the money in his brother's possession from seizure if the conspiracy were to be discovered. The jury could have concluded that Willie Morris was providing "cover" for his brother and that Kenneth Morris was in fact the banker for the conspiracy.

Finally, Kenneth Morris argues that, in <u>Gallo</u>, an inference of knowledge was permissible because Gallo gave inconsistent statements upon being arrested. However, the government in <u>Gallo</u> proved knowledge <u>of the contents of a box</u>, money, that was exchanged between Gallo and a drug dealer from reasonable inferences stemming from the inconsistent statements, not knowledge of the object of the conspiracy. Here, it is well-established in the record that Kenneth Morris knew that he was giving money to Costa.

**B.   Did the trial court err in basing Kenneth Morris' sentence on 285 kilograms of cocaine?**

The district court sentenced Kenneth Morris to a 264 month term. Kenneth Morris argues that the district court erred in basing his sentence on 285 kilograms of cocaine. District court findings about the quantity of drugs on which a sentence should be based are factual findings which are reviewed for clear error. <u>U.S. v. Mitchell</u>, 964 F.2d 454, 457 (5th Cir. 1992).

Kenneth Morris first contends that Costa never testified to the 285 figure, but was confined to testimony that involved only around 105 kilograms. However, in making its determination of the amount of cocaine to be attributed, the district court is not limited to the quantity proved at trial; nor is it limited to evidence admissible at trial. U.S.S.G. § 6A1.3(a), p.s. Kenneth Morris next claims that the exchanges that he participated in involved dollar amounts that could only account for 20 to 22

kilograms. The district court, however, is not limited to the amount of cocaine that Malone directly transacted in, but may also consider other relevant conduct, which includes "conduct of others in furtherance of the execution of the jointly-undertaken criminal activity that was reasonably foreseeable by the defendant." U.S.S.G. § 1B1.3, comment. (n.1).

Finally, Kenneth Morris argues that the district court never made an individualized finding on the amount that he is liable for. However, paragraph 19 of the presentence report, which was adopted by the district court, stated: "The defendant knew, or reasonably should have known, the entire scope of the conspiracy that he was involved in due to his relationship with his brother, Willie Morris, who was the organizer and leader of the Morris Organization."[4] We have held that a long-term drug relationship between the individual defendant and his supplier can form the basis for finding that a defendant could reasonably foresee the entire scope of the enterprise. U.S. v. Devine, 934 F.2d 1325, 1338 (5th Cir.), *cert. denied*, 112 S. Ct. 349 (1991). Here, Kenneth Morris handled the monetary exchanges for the Morris Organization throughout its relationship with Costa. The record reveals that, in May 1989, Kenneth Morris brought $100,000 to Costa and Willie Morris. In September 1989, Kenneth Morris' residence was used to store over $176,000 of Willie Morris' cash. In November 1990, Kenneth Morris delivered $80,000 to Costa. In

---

[4]The presentence report adopted by the district court attributed 285 kilograms of cocaine to the Morris Organization.

December 1990, Costa is taken to Kenneth Morris' residence to receive $180,000. Further, Kenneth Morris' close and trusted relationship with his brother, Willie Morris, the leader of the Morris Organization, as the caretaker of the proceeds put him in a position to both know and foresee the scope of the drug dealing. We find that Kenneth Morris' relationship as the banker or money keeper for his brother formed an adequate basis to conclude that Kenneth Morris could reasonably foresee the entire scope of the drug dealing by the Morris Organization which, as reflected in the presentence report, had received 285 kilograms of cocaine from Costa during the conspiracy.

**C.  Did the trial court err in considering amounts of cocaine not testified to or disclosed to Morris prior to the sentencing hearing?**

Kenneth Morris next objects to the introduction at the sentencing hearing by the government of two exhibits that detailed debriefings of Costa around 14 months prior to trial. Kenneth Morris argues that such a procedure deprives him of confronting the witness and preparing for the information in violation of his rights to confrontation and due process of law. We reject this argument. Kenneth Morris never asked the court for a continuance of the proceedings nor did he request that Costa, the probation officer, or the interviewing agents testify at the sentencing hearing. And as previously stated, the court may rely on evidence not admissible at trial.

## V. Charles B. Malone

### A. Was there a material variance between the indictment and the government's proof at trial that harmed Malone?

Malone argues that he was prejudiced by a material variance between the indictment and the government's proof at trial. We reject this argument for the same reasons outlined above in disposing of Munoz' argument.

### B. Was there sufficient evidence to support a conviction for money laundering?

In its indictment, the government alleged that Malone delivered approximately $150,000 in partial payment for cocaine. In order to obtain a conviction for money laundering, the government must prove that Malone (1) knowingly conducted a financial transaction; (2) which involved the proceeds of an unlawful activity; and (3) with the intent to promote or further that unlawful activity. 18 U.S.C. § 1956(a)(1)(A)(i). At trial, the government relied on the eye-witness identification given by Michael Monkada and Sean Weber, who testified that they saw Malone place a bag in the back seat of Monkada's car. Malone argues that this testimony was "quite suspect" and also points to the fact that, under cross-examination, Weber stated that he could not identify Malone "without reservation."

Malone, however, does not state why the testimony of the two individuals was "quite suspect." Further, although Weber may have qualified his identification of Malone, Monkada did not. Viewing the evidence in the light most favorable to the government, it would be reasonable for a jury to credit the testimony of Monkada in identifying Malone as the individual who delivered the bag of money.

Malone also argues that there was no evidence presented at trial which suggested that he knew that the bag contained the proceeds of an illegal transaction or that he possessed the intent to further the transaction. The jury, however, heard testimony that Malone was involved in distributing cocaine and in counting the proceeds. There was evidence at trial that Malone capped cocaine and that he returned Costa's phone calls to Willie Morris. Further, regarding the specific instance when Malone delivered the bag of money to Monkada and Weber, the evidence indicates that Costa contacted Morris in delivering the money and that the location was set by Costa and Willie Morris. A jury could reasonably conclude beyond a reasonable doubt that Malone knew that he was furthering Willie Morris' cocaine business when he delivered the money. The evidence is sufficient to support Malone's money laundering conviction.

**C.   Did the district court err in basing Malone's sentence on 285 kilograms?**

The district court sentenced Malone to a 235 month term. Malone argues that, although Malone's conspiracy sentence was based on a finding in the presentence report that the Morris Organization was involved in a conspiracy to distribute 285 kilograms of cocaine, the evidence clearly establishes that no more than 120 kilograms were ever delivered to the Morris Organization. Further, Malone claims that, of this 120 kilograms, the Morris Organization sold only 75 kilograms, while the government only linked Malone to a partial payment for a delivery of 45 kilograms.

*1. Foreseeability*. Malone argues that the district court did not attempt to make a finding on whether the drug quantity listed in the presentence report was reasonably foreseeable to Malone. However, in the <u>November 18, 1992 Addendum to the Presentence Report</u>, the <u>Probation Officer's Response</u> states that "the defendant's position within the organization put him in a position to be well aware of the size and scope of the drug trafficking network. Therefore, the base offense level . . . should be based on the total drug amounts involved in the Morris conspiracy," <u>id</u>. at 3. The district court adopted this finding.

Malone next argues that the presentence report does not present sufficient evidence to establish foreseeability. However, an examination of the presentence report proves the contrary. The presentence report states that "<u>Charles Bernard Malone</u> was considered to be Willie Hugh Morris' right hand man. Malone transported cocaine in the Ft. Worth area, picked up money and counted money for Morris. Malone served as a lieutenant in the

Morris' Organization and was viewed as a major participant." Presentence Investigation Report, October 28, 1992, at 6. It is not unreasonable to find that an individual so thoroughly involved in an organization would know the scope and reach of the organization. We hold that the district court was not clearly erroneous in finding foreseeability from such facts.

Malone's reply brief cites U.S. v. Mitchell, 964 F.2d 454 (5th Cir. 1992), arguing that the court in Mitchell focused on the transaction in which the defendant directly participated, id. at 460. But the Mitchell court refused to infer a larger amount because there was no other evidence to support a larger involvement with drugs. Here, Malone delivered cocaine, collected money, and counted money for the Morris Organization, was heavily involved in the conspiracy, and was shown to be Willie Morris' right hand man. Unlike the defendant in Mitchell, it is reasonable to infer that Malone knew that the conspiracy involved more than the drugs that he directly delivered.

Malone next points to the fact that the district court found that Malone did not have a managerial or supervisory role in the conspiracy in denying a three-level increase in his sentence. Citing United States v. Carreon, 11 F.3d 1225 (5th Cir. 1994), Malone then argues that the district court's emphasis on Malone's position within the conspiracy in finding foreseeability contradicts its finding that he was not a manager or supervisor.

In Carreon, the district court explicitly found that the defendant was a key man in finding foreseeability, but rejected the

finding that the defendant was a leader or organizer in increasing his sentence level. Id. at 1231. The Carreon court then held that these two decisions contradicted each other to such an extent that a reversal of the sentencing was necessary to allow the district court the opportunity to clarify and explain its reasoning. Id. We believe that the instant case is distinguishable from Carreon. There were no independent, additional findings with respect to foreseeability other than the district court's findings that the defendant was a key man. Thus, the key man finding contradicted the rejection of the leader/organizer role. In the instant case, the trial court found consistent with the evidence and as suggested by the presentence report that Malone transported cocaine, picked up money, and counted money for the Morris Organization. In addition, there was evidence that he capped cocaine and was the one who returned phone calls to Costa for Willie Morris. Thus, even if Malone was not a manager or supervisor, he was nonetheless in a position as Willie Morris' right hand man (as found by the court) to be aware of and a part of the Morris Organization's overall involvement with Costa in the illicit drug scene. Accordingly, Carreon does not control the disposition of Malone's foreseeability argument.

2. *Quantity of Cocaine*. The district court relied on the presentence report in arriving at 285 kilograms of cocaine. The amount in the presentence report is based on the statements made by Costa to investigative agents. In the November 18, 1992 Addendum to the Presentence Report, the Probation Officer's Response states:

> Investigative agents in this case provided information regarding the amount of cocaine that Victor Costa delivered to the Morris Organization between 1989 and 1990. Costa gave them detailed information regarding the quantities of cocaine he delivered to the Morris organization. According to agents and the Assistant U.S. Attorney assigned to the case, Victor Costa testified that he distributed over 500 kilograms of cocaine to the Ft. Worth area. . . . Therefore, the use of 285 kilograms for the offense level calculations for the Morris Organization is considered to be a conservative estimate of the drug amounts actually distributed during the conspiracy.

Id. at 2. Malone argues that Costa never again made any statements indicating that 285 kilograms were delivered to the Morris Organization and that no other evidence supports this figure.

In making its determination of the amount of cocaine to be attributed to an organization, the district court is not limited to the quantity proved at trial nor is it limited to evidence admissible at trial. U.S.S.G. § 6A1.3(a), p.s. The district court may rely on the information in the presentence report if the information has "some minimum indicium of reliability." U.S. v. Vela, 927 F.2d 197, 201 (5th Cir.), *cert. denied*, 502 U.S. 875, 112 S. Ct. 214 (1991).

Malone claims that the information relied upon by the district court to reach the 285 kilogram figure is unreliable. Malone argues that Costa's testimony is not only uncorroborated, it is also a self-serving confession.[5] Malone claims that Costa had the incentive to implicate others and to reveal high amounts of cocaine

---

[5]Costa had been arrested in February 1991 on an indictment out of the Southern District of Mississippi after one of his cocaine shipments was intercepted. Costa entered into a plea agreement with the Government in which he agreed to testify.

in order to shorten his own potential sentence.  Malone also argues that the evidence at trial only proved that the Morris Organization received 120 kilograms, less than half of the amount the sentence was based upon.

The government cites <u>U.S. v. Cuellar-Flores</u>, 891 F.2d 92 (5th Cir. 1989), for the holding that, in sentencing, a district court may rely on uncorroborated hearsay testimony, <u>id</u>. at 93.  In <u>Cuellar-Flores</u>, the hearsay declarant was the investigating case agent, a law enforcement officer.  <u>Id</u>.  Here, the hearsay came from Costa, the unindicted co-conspirator.  The government also cites <u>United States v. Rodriquez</u>, 897 F.2d 1324 (5th Cir.), *cert. denied*, 498 U.S. 857, 111 S. Ct. 158 (1990).  In <u>Rodriquez</u>, however, corroborating evidence was present.  <u>Id</u>. at 1328.  Nonetheless, we believe that the 285 kilogram amount was sufficiently corroborated and possessed a sufficient indicium of reliability.

Generally, presentence reports are presumed reliable, <u>Gardner v. Florida</u>, 97 S. Ct. 1197, 1205 (1977); <u>U.S. v. Vontsteen</u>, 910 F.2d 187, 190 (5th Cir. 1990), *cert. denied*, 498 U.S. 1074, 111 S. Ct. 801 (1991), because "trained probation officers employ various investigative procedures for verifying information used in their reports," <u>Vontsteen</u>, 910 F.2d at 190.  Here, the verification took the form of the investigation and discovery of Costa's statements under oath at the Fisher trial.  Costa's admission to the agents that he delivered approximately 285 kilograms of cocaine to the Morris Organization is corroborated by his sworn testimony in the Fisher trial that he delivered between 300 and 500 kilograms of

-34-

cocaine to organizations in the Fort Worth area. The 285 kilograms of cocaine reported in the presentence report was sufficiently corroborated. Further, the district court judge heard Costa's testimony at trial and thereby was able to make an assessment of Costa's demeanor and credibility and to view the out-of-court statement in light of his own assessment of Costa and the facts of the conspiracy trial over which he presided. The trial court was thus capable of judging the truthfulness of Costa's out-of-court statements to the investigative agents.

## D.   Was Malone a minor participant?

At sentencing, Malone argued for a two-level decrease in his sentence for minor participant status pursuant to U.S.S.G. § 3B1.1(b), which provides that "a minor participant means any participant who is less culpable than most other participants, but whose role could not be described as minimal." The district court denied this request.

Malone first argues that the evidence clearly establishes that he was less involved than Costa, Willie Morris, and Owens. However, "[t]he fact that some participants may be more culpable than [Malone] does not entitle [Malone] to classification as a minor participant." Molano-Garza v. U.S. Parole Comm'n, 965 F.2d 20, 24 (5th Cir. 1992), *cert. denied*, 113 S. Ct. 1009 (1993).

Malone next argues that Molano-Garza requires that a defendant not be convicted of more serious charges and not receive longer

sentences than the other defendants in order to be found a minor participant. Malone, however, misinterprets <u>Molano-Garza</u>. In rejecting Molano-Garza's claim that he was a minor participant, the court emphasized the fact that "Molano-Garza was convicted of more serious charges than other participants and received a longer sentence than other participants." <u>Id</u>. at 23-24. But the court did not hold that these facts must always be present in order to arrive at this conclusion.

Here, the trial court found that Malone was the right hand man of Willie Morris and was very active in the conspiracy. Accordingly, the trial court did not err in finding that Malone was not a minor participant.[6]

## CONCLUSION

For the foregoing reasons, we **AFFIRM** the defendants' convictions and sentences.

---

[6]Malone also argues that his Sixth Amendment Right to Confrontation and his Fifth Amendment Right to Due Process were violated because he could not cross-examine Costa, whose statements to investigative agents formed the basis for the 285 kilograms figure in the presentence report. Malone made no objections in the district court to preserve these arguments. We decline to initially address them on appeal.