United States Court of Appeals
Fifth Circuit

**F I L E D**

March 9, 2007

Charles R. Fulbruge III
Clerk

UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

No. 05-41071

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

VERSUS

JULIA MAY DAWES, TOM FRANKLIN MORRIS,
and STEVEN WAYNE PAYNE,

Defendants-Appellants.

Appeals from the United States District Court
For the Eastern District of Texas

(04-CR-92)

Before REAVLEY, DeMOSS, and BENAVIDES, Circuit

Judges.

PER CURIAM:[*]

---

[*]Pursuant to 5th Cir. R. 47.5, the Court has determined that this opinion should not be published and

A grand jury indicted Appellants Julia Dawes ("Dawes"), Steven Payne ("Payne"), and Tom Morris ("Morris"), among others, for their roles in a drug manufacturing and distribution ring in Paris, Texas. The Appellants were charged with one count of conspiring to manufacture, distribute, and possess methamphetamine in violation of 21 U.S.C. § 841(a)(1). The Appellants were tried together and found guilty by a jury on February 1, 2005.[2] The Appellants assert various claims of error. Finding no reversible error, we affirm.

## I. Facts and Background

On June 29, 2004, the government unsealed an

is not precedent except under the limited circumstances set forth in 5th Cir. R. 47.5.4.

[2] The indictment additionally charged Morris with possession with the intent to distribute approximately 1.2 grams of methamphetamine. The jury convicted him of that charge as well.

indictment naming twelve individuals as co-conspirators in an alleged methamphetamine manufacturing and distribution operation. Among those named were the Appellants, and they proceeded to a joint jury trial.

According to trial testimony from a government investigator, Richard Dixon was the "hub" of the conspiracy and the Appellants, at different times, supplied Dixon with methamphetamine for personal use and resale. Dixon, having already plead guilty, testified against the Appellants at their trial. He stated that he purchased methamphetamine from Julia Dawes from the middle of 2001 until November, 2002. Dixon further testified that he initially purchased small amounts from Dawes for his personal use, but after about four months, he began to buy more substantial quantities to sell. Dixon estimated that he purchased approximately 250 grams from Dawes.

Dixon went on to testify that he started buying methamphetamine from Payne in February 2003. He stated Payne supplied him with about one ounce (approximately 28 grams) per month until March 2004, totaling between 300 and 400 grams. Dixon also testified he was aware that Payne supplied others with methamphetamine as well.

Regarding Morris, Dixon further testified that he was acquainted with him and at different times he both sold and purchased methamphetamine from Morris, although it appears from the testimony that the quantities were small. Dixon also bought and sold drugs to Cody Berry, who was at Morris's house the day he was arrested.

In addition to Dixon's testimony, the government presented other evidence of Appellants' involvement in the conspiracy. For example, Toby Tidwell testified that he purchased methamphetamine from Dawes at her home on

4

a number of occasions, often two to three times per week. While at her home he witnessed Dawes in possession of five to eight ounces (approximately 140 to 224 grams) of methamphetamine. He stated that over the span of three to four months he purchased about five ounces (approximately 140 grams) from Dawes. He also testified that he facilitated a transaction where Dawes sold $2,000 worth of methamphetamine to another person. In addition, Andrea Allen and Richard Aubrey both testified against Dawes. Aubrey testified he witnessed Dawes use methamphetamine and possess at least one ounce. Allen's testimony primarily corroborated the testimony of Dixon and Tidwell. Also, upon Dawes's arrest, police discovered small amounts of methamphetamine on her person and in her house.

The government presented additional evidence against

Payne as well. At trial the government showed a video of Payne admitting responsibility for 750 to 1,400 grams of methamphetamine. Additionally, witnesses Tony Freelen, Keri Pinalto, and Angela Pendergraft all testified they received methamphetamine from Payne. In particular, Pinalto stated she purchased an "eight ball" (equal to about four grams) of methamphetamine from Payne several times per month between March 2003 and February 2004.

The evidence against Tom Morris included both witness testimony and physical evidence. Following a confidential informant's purchase of methamphetamine at Morris's house, police searched the house and found baggies of methamphetamine along with drug paraphernalia, including scales. A number of witnesses testified they purchased methamphetamine from Morris, including Donald Benton, who purchased approximately 18.5 grams from

Morris during 2004. In addition, Crystal King testified she witnessed a friend buy between two and three eight balls on one occasion.

After hearing the evidence, the jury found each Appellant guilty of conspiracy. The jury additionally found Morris guilty of possession with the intent to distribute 1.2 grams of methamphetamine. The Appellants each received substantial sentences. The court sentenced Dawes to 151 months' imprisonment, Payne to 121 months, and Morris to 350 months. Each timely appealed raising several claimed errors, many of which do not require discussion. However, each Appellant argues it was error for the jury to consider co-conspirator actions in reaching the 500 gram threshold, as opposed to considering their actions separately. We consider each Appellant's argument on this issue in turn.

## II. Discussion

## A. Julia Dawes

Dawes claims there is a variance between the indictment and the evidence presented at trial. She contends the indictment alleges one large conspiracy involving more than 500 grams of methamphetamine, but the evidence at trial showed only several smaller conspiracies. She argues that because, at most, she was involved in a small conspiracy that amounted to less than 500 grams, her conviction cannot stand. To prevail on a variance claim Dawes must show (1) a variance between the indictment and the evidence at trial, and (2) that her substantial rights were prejudiced. *See United States v. Payne*, 99 F.3d 1273, 1279 (5th Cir. 1996). Because we find no variance, we need not consider prejudice to Dawes's substantial rights.

Dawes argues the government alleged a large

overarching conspiracy but proved several smaller conspiracies. To determine whether the government proved a single conspiracy we consider (1) the existence of a common goal, (2) the nature of the scheme, and (3) the overlapping of the participants in the various dealings. *United States v. Morris*, 46 F.3d 410, 415 (5th Cir. 1995). In considering these factors, "we must affirm the jury's finding that the government proved a single conspiracy unless the evidence and all reasonable inferences, examined in the light most favorable to the government, would preclude reasonable jurors from finding a single conspiracy beyond a reasonable doubt." *Id.* (internal quotation marks and alterations omitted).

a. Common Goal

"Where the evidence demonstrates that all of the alleged co-conspirators directed their efforts towards the

9

accomplishment of a single goal or common purpose, then a single conspiracy exists. *United States v. Richerson*, 833 F.2d 1147, 1153 (5th Cir. 1987). We have broadly defined this factor. *See, e.g.*, *Morris*, 46 F.3d at 415; *see also Richerson*, 833 F.2d at 1153 (collecting cases that emphasize our expansive application of this factor). Also, we have often found that personal gain from selling drugs is a common goal. *See Morris*, 46 F.3d at 415 ("The common goal of everyone involved, the suppliers, [the cocaine distributor], and the purchasers, was to derive personal gain from the illicit business of buying and selling cocaine."); *see also Payne*, 99 F.3d at 1280 (finding the participants had the common goal of selling crack).

Dawes's role for over a year was to sell drugs to Dixon that he could re-sell to others. Dawes thus shared a common goal with other co-conspirators--profiting from the

continued operation of Dixon's drug business. Under our broad definition, we find this element satisfied.

b. Nature of the Scheme

The proper inquiry is whether "the activities of one aspect of the scheme are necessary or advantageous to the success of another aspect or to the overall success of the venture, where there are several parts inherent in a larger common plan." *Morris*, 46 F.3d at 416. In other words, when an "agreement contemplates bringing to pass a continuous result that will not continue without the continuous cooperation of the conspirators to keep it up, then such agreement constitutes a single conspiracy." *Id.* at 415-16 (quotation omitted).

If we consider the Appellants' actions only in relation to each other, and ignore the actions of other co-conspirators, it could be argued they participated in

11

unrelated transactions that were not part of a larger scheme. For example, the evidence showed that Dawes and Payne supplied Dixon with methamphetamine at different times and never agreed to cooperate with each other.

However, we must look at the entire conspiracy and determine if the activities of one aspect of the scheme were necessary or advantageous to the success of another aspect or to the overall success of the venture. *See Morris*, 46 F.3d at 416. It is clear that Appellants' primary activity-- supplying drugs--was advantageous to the overall success of Dixon's drug distribution business. Thus, we find that Appellants' activities were advantageous to the overall success of the venture.

c. Overlapping of Participants in the Various Dealings.

"The more interconnected the various relationships

are, the more likely there is a single conspiracy." *Morris*, 46 F.3d at 416. However, it is not required that each conspirator participate in every transaction. *Id.* "A single conspiracy exists where a 'key man' is involved in and directs illegal activities, while various combinations of other participants exert individual efforts toward a common goal." *Id.*

The evidence at trial did not directly link Dawes to the other Appellants, but it did link her to other co-conspirators, most notably Dixon and Toby Tidwell. It was clearly established that Dawes sold methamphetamine to Dixon and Tidwell and was acquainted with a number of the other co-conspirators. The evidence also connected Payne and Morris to others in the conspiracy.

Dixon was the "key man" and directed a drug distribution ring, and Dawes, among others, exerted

individual efforts towards a common goal of furthering that business for her own benefit. *See id.* Thus, we find this element satisfied.

Based on the foregoing, and examining the evidence and all reasonable inferences in the light most favorable to the government, we find a reasonable jury could have concluded the government proved one conspiracy.

The result is that the well-known *Pinkerton* rule applies to the Appellants' actions. *See Pinkerton v. United States*, 328 U.S. 640 (1946). Under that rule reasonably foreseeable actions of co-conspirators can be attributed to Dawes, even if she did not know about them. *See United States v. Wilson*, 105 F.3d 219, 221 (5th Cir. 1997). Despite Dawes's argument to the contrary, it was reasonable for her to foresee that Dixon would purchase methamphetamine from other suppliers. Thus, a reasonable

14

jury could find that Dawes's direct involvement, coupled with the reasonably foreseeable actions of her co-conspirators, resulted in her responsibility for 500 grams, as alleged in the indictment.

B. Steven Payne

Payne moved for a judgment of acquittal below and argues on appeal that the government presented insufficient evidence that he knew of, or participated in, a conspiracy. When a defendant has moved for a judgment of acquittal, we review challenges to the sufficiency of the evidence by determining whether a rational jury could have found the elements of the offense beyond a reasonable doubt, when the evidence is viewed in the light most favorable to the verdict. *United States v. Patterson*, 431 F.3d 832, 836 (5th Cir. 2005).

The thrust of Payne's argument is that even if the

government proved a conspiracy, it did not prove he was involved. However, the evidence at trial established Payne's significant involvement in a large-scale methamphetamine ring. Payne himself admitted being responsible for up to 1,400 grams of methamphetamine. Further, Dixon testified he purchased between 300 and 400 grams from Payne. Based on this evidence a rational jury, even considering Payne's transactions alone, could have found that he was responsible for 500 grams of methamphetamine.

C. Tom Morris

Morris argues the district court erred by not responding to a question posed by the jury during its deliberations.[3] In deciding how to respond to a question posed by the jury, the district court enjoys wide latitude. *United States v.*

---

[3]The other Appellants raise this issue as well. We note that Morris does not challenge the sufficiency of the evidence tying him to the conspiracy.

*Stevens*, 38 F.3d 167, 170 (5th Cir. 1994); *see United States v. Garza*, 754 F.2d 1202, 1210 (5th Cir. 1985) ("the *necessity*, extent, and character of any supplemental instructions to the jury are matters within the discretion of the district court.) (emphasis added) (internal quotation marks omitted).

The court's response to the jury question in this case was a note requiring them to consider the original instructions. In response to a jury question it is acceptable for the court to refer the jury to the original instructions as long as they contain an accurate statement of the law. *See United States v. Arnold*, 416 F.3d 349, 359 n.13 (5th Cir. 2005). Here, we are satisfied the original instructions contained an accurate statement of the law and that the court acted within its wide discretion. Thus, find no error.

After reviewing Appellants' other claims of error, the

briefs and the record, and after consulting the applicable law, we find no reversible error. Accordingly, we affirm.

AFFIRMED.