# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

August 2, 2012

No. 10-50970

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

ROSALINDA DELEON; GILBERTO DELEON, III; LEOBARDO GARCIA-
DUARTE,

Defendants - Appellants

Appeals from the United States District Court
for the Western District of Texas
USDC No. 2:08-CR-593-10

Before HIGGINBOTHAM, HAYNES, and HIGGINSON, Circuit Judges.

PER CURIAM:[*]

Rosalinda DeLeon, Gilberto DeLeon, III, and Leobardo Garcia-Duarte
(collectively, "Appellants") were tried together and each convicted of one count
of conspiracy to transport illegal aliens in violation of 8 U.S.C.
§ 1324(a)(1)(A)(v)(I) and (B)(i).[1] Appellants contend that the district court erred

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not
be published and is not precedent except under the limited circumstances set forth in 5TH CIR.
R. 47.5.4.

[1] Because they have the same last name, this opinion refers to Rosalinda DeLeon as
"Rosalinda," and Gilberto DeLeon, III as "Gilberto." We refer to Leobardo Garcia-Duarte as
"Garcia-Duarte."

No. 10-50970

in instructing the jury because: (1) it failed to set out the substantive elements of the crime in the application portion of the jury instructions; (2) it failed to instruct the jury that one of the co-conspirators must have committed an overt act; and (3) the indictment and the jury instructions were duplicitous, resulting in a non-unanimous jury verdict, because conspiracy to transport illegal aliens and an attempt to do so were pleaded together in the indictment and because the jury was not required to unanimously select between the two in reaching a guilty verdict.    Gilberto and Garcia-Duarte also argue that the evidence was insufficient to support their conviction.  Further, Garcia-Duarte argues that the district court abused its discretion by admitting hearsay statements of co-conspirators, as he contends that the Government failed to prove the existence of a single conspiracy.  Finally, both Garcia-Duarte and Gilberto challenge their sentences, contending that the district court erred in applying several sentencing enhancements and that their sentences were unreasonable.  We AFFIRM.

## I.  FACTS AND PROCEDURAL HISTORY

Appellants were arrested and indicted after the Government concluded an investigation into what it believed to be an alien smuggling ring.  Appellants were tried together, and the jury found each guilty of one count of conspiracy to transport illegal aliens in violation of 8 U.S.C. § 1324(a)(1)(A)(v)(I) and (B)(i).  Appellants presented no evidence at trial, resting after the close of the Government's case.  Each appellant timely appealed.  Below we present a brief overview of the evidence presented at trial against each Appellant.

A.    Evidence Pertaining to Rosalinda

A co-conspirator named Mary Jo Rodriguez ("Rodriguez")—one of Rosalinda's cousins—testified that Rosalinda instructed her to pick up three illegal aliens in Uvalde, Texas and drop them off at an agreed-upon residence.  Rosalinda was present when Rodriguez dropped off the illegal aliens.  Another co-conspirator testified that on a different occasion, after she dropped illegal

No. 10-50970

aliens off at the same house and was paid, she saw the illegal aliens get in the car with Rosalinda.

Pablo Aviles ("Aviles")—who was working for the Government in exchange for receiving a temporary visa and, on at least one occasion, payment—testified that Rosalinda was employed as a scout for Appellants' alien smuggling group and that he employed her in May 2007. Aviles worked for Garcia-Duarte and Garcia-Duarte's brother, Leodegardo,[2] transporting illegal aliens. A scout acts as a lookout and helps the person driving the illegal aliens to avoid law enforcement.

An investigator for the Government testified that Rosalinda received total payments of $7,030 through Western Union, and these payments were made from offices clustered around Garcia-Duarte's apartment complex in Houston. The payments were each below the threshold amount that would require the payor to show identification. When a Government agent attempted to track the payor by matching the name to the address given, he found that no one by that name lived at that address.

B.    Evidence Pertaining to Gilberto

Aviles testified that he used Gilberto as a scout on five or more occasions. Aviles also testified that Gilberto allowed him to stay overnight once while Aviles waited for twelve illegal aliens to arrive at an agreed-upon location.

Additionally, Moises Torres ("Torres")—another co-conspirator—testified about Gilberto's contacts with Garcia-Duarte and other co-conspirators. Torres testified that once, when he picked up a co-conspirator who fled from law enforcement, Gilberto was present at the scheduled pickup location, along with the individual that Torres was paid to pick up.

---

[2] We refer to Garcia-Duarte's brother as "Leodegardo" to avoid confusion between the two men.

No. 10-50970

Law enforcement officers testified that they stopped Gilberto three times in an area "known for alien smuggling traffic." Consistent with Aviles's testimony, the officers testified that Gilberto drove a red Ford Ranger. The first time law enforcement stopped Gilberto was at 3:30 a.m. after Officer Terrell observed Gilberto drive one way, turn his headlights off, and then make a u-turn and drive the other direction.

The next evening, Officer Terrell observed two vehicles behaving strangely at 3:45 a.m. Officer Terrell testified that one vehicle stopped on the highway, and another passed it, turned its headlights off, made a u-turn, and returned to the first truck. The two vehicles then drove in tandem. Officer Terrell attempted to catch up with the two vehicles, but he was unable to do so. After he radioed the incident to other officers, they were able to pull over one of the vehicles, which was a red Ford Ranger driven by Gilberto. While Gilberto was being questioned by the officer, the other vehicle sped past Officer Terrell, who chased it. The driver of the other vehicle abruptly stopped, and the passengers scattered and fled in the brush. The officers eventually apprehended several of the passengers, who were confirmed to be illegal aliens.

Officer Garza conducted a traffic stop on Gilberto's red Ford Ranger several weeks later. Officer Garza testified that Gilberto referred to the stop as a "Rolodex" stop, which is a term used by border patrol agents to refer to suspicious vehicles that are seen in areas that are known for high drug or alien trafficking. Officer Garza testified that he had never heard anyone other than law enforcement use that term before. Additionally, Officer Garza testified that Gilberto appeared to be filming the stop through a camera on the truck's dash.

Finally, a Government investigator testified that Gilberto received total payments of $10,603 through Western Union, and, like the payments to Rosalinda, these payments were made from offices clustered around Garcia-Duarte's apartment complex in Houston.

No. 10-50970

C.     Evidence Pertaining to Garcia-Duarte

Aviles testified that a man named El Guero put him in touch with Garcia-Duarte and Leodegardo. On three occasions, Garcia-Duarte personally sent Aviles on alien-smuggling missions. Garcia-Duarte gave Aviles money to purchase a truck and the contact numbers for scouts, and he was waiting at the stash house when Aviles arrived with the aliens.[3]

Torres stated that he worked for various members of the conspiracy by providing vehicles and altering existing vehicles so that they were more suitable for smuggling aliens. Torres testified that he observed Garcia-Duarte and Leodegardo having discussions together at the garage where Torres worked and at Leodegardo's apartment, where Garcia-Duarte and Leodegardo talked about obtaining vehicles, recruiting drivers, and determining which stash houses to use.

Anna Martinez ("Martinez") next testified that she had a relationship with Garcia-Duarte and gave him access to her house, which Leodegardo later used as a stash house. Martinez believed that Garcia-Duarte was looking for renters for the house, and he persuaded her to leave the utilities on in the house. He was the only one who had access to it. When Martinez went by the house at one point, it was filthy, and Leodegardo told her that she could not enter certain parts of the house. Approximately one week later, Immigrations Customs and Enforcement ("ICE") officers raided the house, where they found five illegal aliens, two firearms, and a ledger that showed names, phone numbers, and currency numbers. The house's exits had been boarded up and were padlocked so that no one could escape from the inside.

Finally, as noted above, there was circumstantial evidence indicating that Garcia-Duarte had sent payments to Rosalinda and Gilberto through Western

---

[3] A stash house is a house used to hold the illegal aliens until the smugglers received payment from their families.

No. 10-50970

Union for their work as scouts, and the Western Union offices from which the money was transmitted were all located near Garcia-Duarte's apartment in Houston.

## II.  JURISDICTION

The district court had jurisdiction pursuant to 18 U.S.C. § 3231.  We have jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

## III.  DISCUSSION

A.     Whether the evidence was sufficient to support Gilberto and Garcia-Duarte's convictions for conspiracy to transport illegal aliens.

Gilberto and Garcia-Duarte preserved their sufficiency challenges, as they moved for a judgment of acquittal at the close of the Government's case and rested without introducing any evidence.  *See United States v. Resio-Trejo*, 45 F.3d 907, 911 n.6 (5th Cir. 1995).  We review the evidence in the light most favorable to the verdict, resolving all credibility determinations and inferences in favor of the verdict.  *Id.* at 910-11.  The evidence is sufficient if the court can "conclude that a rational trier of fact could have found therefrom the essential elements of the crime beyond a reasonable doubt."  *Id.* at 911.  Here, the Government must first prove that there was a conspiracy, which requires proof of an "agreement and [the] defendant's intent and participation in it . . . ." *United States v. Shaddix*, 693 F.2d 1135, 1140 (5th Cir. 1982).  Next, the Government must prove that the object of the conspiracy was: (1) to "transport[], or move[] or attempt[] to transport[] or move [an] alien within the United States"; (2) "knowing[ly] or in reckless disregard of the fact that [the] alien has come to, entered, or remains in the United States in violation of law"; and (3) the transportation was "in furtherance of such violation of law."   8 U.S.C. § 1324(a)(1)(A)(ii). Gilberto and Garcia-Duarte make several challenges related to the sufficiency of the evidence, which are discussed below.

1.   *Whether the evidence was sufficient to show that Gilberto and Garcia-Duarte were aware of and willfully became members of the conspiracy.*

   a.   Garcia-Duarte

Garcia-Duarte argues that the Government failed to prove that he made an agreement or had the intent to join the conspiracy.   However, the Government does not need to prove an express agreement, as "[t]he conspiracy's existence can be inferred from the facts and circumstances of a particular case." *United States v. Robertson*, 659 F.2d 652, 656 (5th Cir. 1981) (citing *Norfolk Monument Co. v. Woodlawn Memorial Gardens*, 394 U.S. 700, 704 (1969)). Evidence of concerted action "can indicate agreement and voluntary participation" in the conspiracy.  *United States v. Quiroz-Hernandez*, 48 F.3d 858, 866 (5th Cir. 1995), *modified on other grounds by* No. 94-60023, 1995 U.S. App. LEXIS 10311 (5th Cir. May 8, 1995).

Resolving all credibility determinations in favor of the Government, the evidence shows that Garcia-Duarte hired Aviles for alien-smuggling missions, gave Aviles money to purchase a truck, gave him the contact numbers of scouts, and was waiting at the stash house when Aviles arrived with the aliens. Additionally, Torres—another co-conspirator—observed Garcia-Duarte and Leodegardo talking about obtaining vehicles, recruiting drivers, and determining which stash houses to use.  Further, Martinez—with whom Garcia-Duarte was allegedly having a romantic relationship—testified that Garcia-Duarte was the only one who had access to her house, which was later found by ICE agents to contain five illegal aliens, two firearms, and a ledger that showed names, phone numbers, and currency numbers.  The house's exits had been boarded up and were padlocked so that no one could escape from the inside.  Although Garcia-Duarte heavily questioned Martinez's credibility, we must resolve all credibility determinations and inferences in favor of the verdict.  *Resio-Trejo*, 45 F.3d at

910-11. We conclude that the evidence was sufficient to support a finding that Garcia-Duarte was aware of and intentionally joined the conspiracy.

> b.     Gilberto

Similarly, we conclude that there was sufficient evidence to support Gilberto's conviction. Gilberto also argues that the Government failed to prove his knowledge of or his intent to join the conspiracy.

The Government showed that Aviles used Gilberto as a scout on five or more occasions, and Gilberto allowed him to stay overnight once while Aviles waited for twelve illegal aliens to arrive at an agreed-upon location. Additionally, Aviles testified that Gilberto drove a red Ford Ranger, and the testimony from three border patrol agents as to Gilberto's activities corroborated Aviles's testimony that Gilberto served as a scout for the conspiracy. Torres also testified as to Gilberto's relationship with Garcia-Duarte. Finally, there was evidence that Gilberto received total payments of over $10,000 through Western Union, and these payments were made from offices clustered around Garcia-Duarte's apartment complex in Houston. This evidence was more than sufficient to support Gilberto's conviction.

> 2.     *Whether the Government failed to prove the illegal status of the aliens.*

Gilberto's contention that the Government failed to offer evidence of the illegal status of the aliens is unfounded. An officer testified that the people who were found in the stash house belonging to Martinez were illegal aliens. Another border patrol officer testified that the aliens who fled from the truck that was stopped after Gilberto was questioned were illegal aliens. Additionally, as noted by the Government, this testimony is bolstered by the "entire nature of the operation," *United States v. Crispin*, 757 F.2d 611, 614 (5th Cir. 1985), as the aliens fled from the vehicle in an attempt to escape law enforcement. Several members of the conspiracy also testified that it was their understanding that

No. 10-50970

they were to transport illegal aliens.  Thus, there is no merit to the argument that the Government failed to prove that Appellants transported illegal aliens.

    *3.    Whether the Government failed to prove a single conspiracy, as alleged in the indictment.*

Garcia-Duarte's argument that the Government proved multiple conspiracies as opposed to only one conspiracy is unavailing.  To determine whether the Government proved just one or multiple conspiracies, we consider: "(1) the existence of a common goal; (2) the nature of the scheme; and (3) the overlapping of the participants in the various dealings." *United States v. Morris*, 46 F.3d 410, 415 (5th Cir. 1995).  "In examining these factors, 'we must affirm the jury's finding that the government proved a single conspiracy unless the evidence and all reasonable inferences, examined in the light most favorable to the government, would preclude reasonable jurors from finding a single conspiracy beyond a reasonable doubt.'" *Id.* (quoting *United States v. DeVarona*, 872 F.3 114, 118 (5th Cir. 1989) (internal modifications omitted)).  "The 'common goal' factor used to count conspiracies has been defined broadly by this court." *United States v. Morrow*, 177 F.3d 272, 291 (5th Cir. 1999) (per curiam) (citing *Morris*, 46 F.3d at 415).  For example, we have held that the goal of deriving personal gain from an illicit business of buying and selling drugs is a "common goal." *Morris*, 46 F.3d at 415.  Similarly, in this case, the goal of deriving financial gain from transporting illegal aliens was a "common goal." The nature of the scheme and the overlap in participants also supports the finding of a single conspiracy.

For example, Garcia-Duarte, Leodegardo, Aviles, Gilberto, and Rosalinda are all overlapping figures that appear throughout the trial.  El Guero, Aviles and Torres worked with each of the Appellants, allowing the jury to infer that they were all part of the same enterprise.  The majority of their illicit activities

occurred between mid-2007 and early 2008.  Appellants were also linked to each other.  Rosalinda and Gilberto both received Western Union transfers from locations near Garcia-Duarte's apartment.  Aviles testified that he employed both Rosalinda and Gilberto as scouts for the conspiracy.  On one occasion, Gilberto sent his sister, Rosalinda, in his place to pick up and take Aviles to Gilberto's home.  Ultimately, the district judge specifically instructed the jury that, "[i]f you find that a defendant was not a member of the conspiracy charged in the indictment, then you must find that defendant not guilty, even though that defendant may have been a member of some other conspiracy."  In light of the judge's instruction, we conclude that the evidence supported the jury's finding that there was a single conspiracy.

B.  <u>Whether the district court erred in instructing the jury where the substantive elements of the crime were set out in the jury instructions but not in the same paragraph as the instructions on conspiracy.</u>

Appellants concede that they failed to object to the jury instructions; therefore, our review is limited to plain error.  *See* FED. R. CRIM. P. 52(b).  To establish plain error, "[t]here must be an 'error' that is 'plain' and that 'affect[s] substantial rights.'"  *United States v. Olano*, 507 U.S. 725, 732 (1993) (alteration in original).  Additionally, even if this test is met, the decision whether to correct the error lies "within the sound discretion of the court of appeals, and the court should not exercise that discretion unless the error 'seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings.'"  *Id.* (alteration in original) (quoting *United States v. Young*, 470 U.S. 1, 15 (1985)).  We have held that "when a jury instruction omits or significantly misstates an essential element of an offense, the error may be severe enough to meet the plain-error standard."  *United States v. Allen*, 587 F.3d 246, 255 (5th Cir. 2009) (per curiam) (citation, alteration, and internal quotation marks omitted).  If, "considering the

No. 10-50970

entire charge and evidence presented against the defendant, there is a likelihood of a grave miscarriage of justice," then the defendant has satisfied the plain error standard. *Id.* at 255-56. "The relevant inquiry is whether the erroneous standard used could have meant the difference between acquittal and conviction." *Id.* at 256 (citation and internal quotation marks omitted).

Appellants argue that the jury instructions erroneously omitted the following elements: (1) that Appellants knowingly and intentionally entered into an agreement to transport the aliens; and (2) that Appellants knowingly or recklessly disregarded the fact that an alien was in the United States in violation of the law. Appellants concede that the district court included the relevant statutory language in full from the indictment in the jury instructions; however, they argue that because the paragraph stating the conspiracy instruction does not list all of the elements of the substantive offense, the jury instructions as a whole are improper. They cite to the following portion of the jury instructions:

> For you to find the defendant guilty of this crime, as charged in Count One, you must be convinced that the government has proved each of the following beyond a reasonable doubt:

> First:    That a defendant and at least one other person made an agreement to transport or move, or attempt to transport or move, an alien within the United States as charged in the indictment;

> Second    That the defendant knew of the unlawful purpose of the agreement and joined it willfully, that is, with the intent to further the unlawful purpose.

The jury instructions state that:

> Title 8, United States Code, Section 1324(a)(1)(A)(v)(i), makes it a crime for anyone to conspire or agree with someone else who knowingly, or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, transports or moves, or attempts to transport or move, such alien

11

within the United States by means of transportation or otherwise, in furtherance of such violation of law.

Thus, on the same page as the challenged portion of the instruction, the district court instructed the jury that the statute requires knowing or reckless disregard that an alien was in the United States in violation of the law. Additionally, on the page immediately before the challenged portion of the instruction, the district court noted that the indictment charged Appellants with "knowingly and intentionally combin[ing], conspir[ing], confederat[ing] and agree[ing] together and with each other . . . to commit the following offense . . . ." The district court did, in fact, instruct the jury on the elements that Appellants allege are missing.

While the district court's instructions could have been more clear, we conclude that any error did not rise to the level of plain error, because when considered in their entirety, the instructions did not omit any elements of the offense. *See United States v. Armstrong*, 619 F.3d 380, 386-87 (5th Cir. 2010). The Supreme Court has noted that its decisions "repeatedly have cautioned that instructions must be evaluated not in isolation but in the context of the entire charge." *Jones v. United States*, 527 U.S. 373, 391 (1999). The Court stated that "instructions that might be ambiguous in the abstract can be cured when read in conjunction with other instructions." *Id.* Read as a whole, we conclude that the charge contained all of the elements of the offense. Therefore, we reject Appellants' argument that the jury instructions were plainly erroneous for failing to include an essential element of the offense.

C.    Whether the district court plainly erred in instructing the jury by omitting the element of an overt act.

Turning to the issue of whether exclusion of the "requirement" of an overt act was plain error, we conclude that Appellants fail to establish plain error because even if there was an error—which is debatable—the error was not

"plain." Appellants concede that the Supreme Court has not ruled on whether 8 U.S.C. § 1324 requires proof of an overt act, and this circuit has declined to address the issue. Further, the statute is silent on whether an overt act is required, and the Supreme Court has held that similarly silent criminal code sections do not require proof of an overt act. *See, e.g.*, *Whitfield v. United States*, 543 U.S. 209, 214 (2005) (noting that proof of an overt act is not required under 18 U.S.C. § 1956(h) because "the text . . . does not expressly make the commission of an overt act an element of the conspiracy offense . . . ."); *United States v. Shabani*, 513 U.S. 10, 13-14 (1994) (same as to 21 U.S.C. § 846). Additionally, although we declined to address the issue, we have noted that the Government's argument that an overt act is not required under 8 U.S.C. § 1324 "is perhaps correct in light of this Supreme Court precedent . . . ." *United States v. Lopez*, 392 F. App'x 245, 253 (5th Cir.) (per curiam) (unpublished), *cert. denied*, 131 S. Ct. 807 (2010). Thus, it is not clear that the failure to prove an overt act was an error, much less an error that was "plain." Therefore, we reject Appellants' argument that the jury charge was defective for failing to require proof of an overt act.

D.    Whether the indictment and the jury instructions were duplicitous and resulted in a non-unanimous jury verdict.

Appellants make two arguments with respect to the indictment and jury instructions: they argue that the jury instructions resulted in a non-unanimous verdict and that the indictment was duplicitous. We address these issues separately, because, although closely related, they are distinct. *See United States v. Correa-Ventura*, 6 F.3d 1070, 1081 (5th Cir. 1993).

*1.    Unanimity*

First, Appellants argue that there was a flaw in the jury instructions, since they charged both a conspiracy to transport illegal aliens *and* an attempt

13

to do so as a single offense.  Relying on a Ninth Circuit case, they allege that conspiracy to attempt to transport aliens requires proof of specific intent, whereas conspiracy to transport aliens does not.  *See United States v. Ramirez-Martinez*, 273 F.3d 903, 914 (9th Cir. 2001), *overruled in part on other grounds by United States v. Lopez*, 484 F.3d 1186 (9th Cir. 2007) (en banc). Since they contend that the elements of the two crimes are different, and since the crimes were not charged separately, Appellants argue that the district court should have instructed the jurors that they must agree about which crime Appellants committed.

Appellants admit that we have rejected the argument that immigration offenses require proof of specific intent.  *See United States v. De Jesus-Batres*, 410 F.3d 154, 162 (5th Cir. 2005).  Because they essentially concede that, therefore, any error was not plain under our case law, they urge this court to reconsider *De Jesus-Batres* in light of the Supreme Court's decision in *United States v. Resendiz-Ponce*, 549 U.S. 102 (2007), which they contend counsels in favor of finding that an attempted immigration offense includes the common law elements of attempt.  According to Appellants, this includes specific intent. However, *Resendiz-Ponce* discusses whether an indictment charging a defendant with attempted illegal reentry was defective for failing to allege that an overt act was committed.  *Id.* at 103.  That case does not directly discuss whether proof of specific intent is required for attempted immigration crimes.  Thus, *Resendiz-Ponce* does not make the alleged error "plain," and the fact that Appellants urge reconsideration of Fifth Circuit precedent based on a case that does not clearly overrule our precedent indicates that the error was not "plain."  We therefore hold that the district court did not plainly err in charging the jury as it did.

2. *Duplicity*

Additionally, Appellants argue that the indictment was duplicitous. This inquiry, which is similar to the unanimity issue, has to do with whether "distinct and separate 'offenses' are alleged in one count." *Correa-Ventura*, 6 F.3d at 1081 n.18. The difference between the unanimity and duplicity points of error is the procedural posture in which they arise: a duplicity challenge is a challenge to the indictment (i.e., pretrial), while a unanimity challenge is raised after all of the evidence has been presented. *Id.* at 1081.

Appellants waived this issue by failing to raise it below. *See United States v. Creech*, 408 F.3d 264, 270 (5th Cir. 2005) (finding that an appellant waived an objection to the duplicity of the indictment by failing to raise it below). As we pointed out in *Creech*, "[o]bjections to the indictment, such as objections on the basis of duplicity, must be raised prior to trial." *Id.* (citing FED. R. CRIM. P. 12(b)(3) & (e); *United States v. Baytank (Hous.), Inc.*, 934 F.2d 599, 608-09 (5th Cir. 1991)). Appellants admit that they failed to raise this issue before trial; therefore, we conclude that this issue waived.

E.    <u>Whether the district court erred in admitting statements of co-conspirators during the trial.</u>

Garcia-Duarte contends that the district court erroneously admitted the hearsay statements of co-conspirators over his objection during trial. He argues that the prosecutor failed to prove that the people who made the statements were actually co-conspirators. Specifically, he contends that there is insufficient evidence to establish a conspiracy between: (1) Gilberto and Rosalinda; (2) Garcia-Duarte and Leodegardo; (3) Aviles, Torres, and Martinez and Garcia-Duarte; (4) and "El Guero" or "Pelon," who were not specifically named as alleged co-conspirators and did not testify at trial.

No. 10-50970

We review a district court's evidentiary rulings for an abuse of discretion. *United States v. Hall*, 500 F.3d 439, 443 (5th Cir. 2007). Additionally, even if an error occurred, the error does not require reversal if it was harmless. *Id.*

A statement is not hearsay if it is made "by the party's co-conspirator during and in furtherance of the conspiracy." FED. R. EVID. 801(d)(2)(E). "To introduce a co-conspirator statement, the government ha[s] to prove by a preponderance of the evidence: (1) the existence of the conspiracy; (2) the statement was made by a co-conspirator of the party; (3) the statement was made during the course of the conspiracy; and (4) the statement was made in furtherance of the conspiracy." *Hall*, 500 F.3d at 443. Rule 801(d)(2) provides that "[t]he statement must be considered but does not by itself establish . . . the existence of the conspiracy or participation in it . . . ." FED. R. EVID. 801(d)(2).

As discussed in detail above, there was more than sufficient evidence to establish a conspiracy between: (1) Gilberto and Rosalinda; (2) Garcia-Duarte and Leodegardo; and (3) Aviles, Torres, and Martinez and Garcia-Duarte. Therefore, we reject Garcia-Duarte's challenge to the admission of these statements, as the Government established that they were involved in the same conspiracy to transport illegal aliens, and their statements were therefore not hearsay. *See* FED. R. EVID. 801(d)(2)(E).

Garcia-Duarte also challenges whether the Government sufficiently established a connection between him and El Guero and Pelon. Even declining to consider El Guero's statements themselves, there was more than sufficient evidence to support the district court's finding that El Guero's statements were admissible because he was a member of the conspiracy, and his statements were made during the course and in furtherance of the conspiracy. *Hall*, 500 F.3d at 443. Aviles testified that he met Leodegardo and Garcia-Duarte through El Guero, and that he did the same thing for Leodegardo that he did for El

16

Guero—smuggle aliens.  He also testified that depending on whether it was Leodegardo or El Guero who sent him on a smuggling mission, he would call them to obtain the number for the scout who would be working that particular day.  He stated that he ran between 20 and 40 loads for El Guero, Garcia-Duarte, and Leodegardo.  Thus, the Government offered sufficient evidence to tie El Guero to the conspiracy and to establish that his statements were made in the course and in furtherance of the conspiracy.  The district court did not abuse its discretion in admitting El Guero's statements.

With respect to Pelon, we conclude that even if the district court's decision to admit Pelon's statements was erroneous, any such error was harmless, as there was more than sufficient evidence of Garcia-Duarte's guilt, as discussed above.  Pelon's statements were a very small part of the evidence offered against Garcia-Duarte.  Even absent this evidence, the jury could easily have found that Garcia-Duarte was guilty of the offense charged.

F.     Whether the district court erred in calculating Gilberto's and Garcia-Duarte's sentences.

   1.     *Enhancement for 100 or More Aliens*

Both Garcia-Duarte and Gilberto objected at sentencing to being held responsible for transporting over 100 aliens.  We review the district court's interpretation of the Guidelines de novo and its factual findings on this issue for clear error.  *United States v. Brooks*, 681 F.3d 678, 712 (5th Cir. 2012); *United States v. Valencia*, 44 F.3d 269, 272 (5th Cir. 1995).  The number of aliens attributable to a defendant is a factual finding reviewable for clear error.  *United States v. Williams*, 610 F.3d 271, 292 (5th Cir. 2010).  If a factual finding is plausible in light of the record as a whole, it is not clearly erroneous.  *Valencia*, 44 F.3d at 272.  Both Appellants can be held responsible for "all reasonably foreseeable acts and omissions of others in furtherance of jointly undertaken

criminal activity . . . ." U.S. SENTENCING GUIDELINES MANUAL § 1B1.3(a)(1)(B) [hereinafter "U.S.S.G."]. However, the scope of the particular defendant's criminal activity "is not necessarily the same as the scope of the entire conspiracy, and hence relevant conduct is not necessarily the same for every participant." *Id.* § 1B1.3(a)(1)(B) cmt. 2.

Garcia-Duarte and Gilberto rely on the fact that the evidence at trial proved multiple conspiracies rather than one conspiracy; therefore, they contend that they should not be held responsible for the conduct of members who were not part of their conspiracy. However, as noted above, there was sufficient evidence for the jury to have found one conspiracy.

Garcia-Duarte and Gilberto also argue that the district court held them responsible for other co-conspirators' conduct that was not foreseeable to them. "Foreseeability is a question of fact and is therefore reviewed for clear error." *United States v. Rodriguez*, 553 F.3d 380, 395 (5th Cir. 2008). Here, the fact that Garcia-Duarte and Gilberto were members of a group that smuggled large quantities of illegal aliens made it reasonably foreseeable that other members of the conspiracy might also smuggle aliens for which Garcia-Duarte and Gilberto would be held responsible.

The Pre-Sentence Reports ("PSR") held Garcia-Duarte responsible for smuggling 485 aliens and Gilberto responsible for smuggling 459 aliens.[4] However, even a conservative view of the PSRs—which would consider only the relevant conduct of the core members of the conspiracy—easily leads to a conclusion that Garcia-Duarte and Gilberto should be held responsible for over

---

[4] The two numbers are different because the relevant time periods that the two defendants were involved in the conspiracy were different.

100 aliens.[5]   Thus, even if the district court disregarded evidence about those who were not proven at trial to be members of the conspiracy, the court still would have had sufficient evidence for this enhancement.  Therefore, the district court did not clearly err in finding that Garcia-Duarte and Gilberto were responsible for smuggling over 100 aliens, and that the conduct of others who were proven at trial to be a part of the conspiracy was reasonably foreseeable to them.

*2.    Enhancement for Detention Through Coercion or Threat*

Similar to the enhancement based on the number of aliens, the enhancement for detention through coercion or threat is also a factual finding that is evaluated for clear error.  *See Valencia*, 44 F.3d at 272.  There is evidence from which the district court could have concluded that aliens were detained through coercion or threat.

a.    Garcia-Duarte

At trial, the Government presented evidence that Garcia-Duarte was responsible for using Martinez's house as a stash house and that the exits of the house were boarded up and/or padlocked from the outside to prevent those inside from escaping.  Garcia-Duarte was directly tied to this house by both Martinez's testimony and the fact that ICE agents found a ledger linked to Garcia-Duarte inside the residence.  The PSR also indicates that five undocumented aliens were

---

[5] For example, Garcia-Duarte's PSR showed that Leodegardo, Gilberto, Rosalinda, and Garcia-Duarte were responsible for smuggling, or for hiring others to smuggle, *at least* 146 aliens.  *See* Garcia-Duarte's PSR ¶¶30 (2 aliens), 31 (11 aliens), 34 (14 aliens), 36 (26 aliens), 38 (3 aliens), 41 (13 aliens), 44 (8 aliens), 46 (6 aliens), 47 (18 aliens), 50 (5 aliens), 52 (40 aliens).

Gilberto's PSR showed that Leodegardo, Garcia-Duarte, Gilberto, and Rosalinda are responsible for smuggling *at least* 134 aliens.  *See* Gilberto's PSR ¶¶30 (2 aliens), 31 (11 aliens), 34 (14 aliens), 35 (1 alien), 36 (26 aliens), 38 (3 aliens), 41 (13 aliens), 44 (6 aliens), 45 (18 aliens), 50 (40 aliens).

kept in the residence's garage. The evidence was clear that Garcia-Duarte should be held responsible for this conduct.

      b.    <u>Gilberto</u>

As to Gilberto, the district court did not clearly err in holding him responsible, as this conduct was a foreseeable "act[]. . . of others in furtherance of the jointly undertaken criminal activity." U.S.S.G. § 1B1.3(a)(1)(B). It was reasonably foreseeable that the other co-conspirators of the scouts or drivers would forcibly hold the aliens until their relatives paid. Indeed, testimony at trial showed that conspirators would be paid half of the amount up front and then receive the other half when the aliens' relatives paid. It was foreseeable that the aliens must be held somewhere until their families made the second payment; therefore, the district court properly applied this enhancement to Gilberto.

      *3.    Weapon Enhancement*

Garcia-Duarte argues that the district court erred in finding that he used a dangerous weapon in the commission of the offense. He contends that it was not reasonably foreseeable to him that a dangerous weapon would be used. However, the dangerous weapon was procured by Leodegardo—Garcia-Duarte's brother and a co-conspirator—and it was found at the stash house that was directly tied to Garcia-Duarte himself. Thus, it was not clearly erroneous for the district court to find that the use of a firearm was reasonably foreseeable to Garcia-Duarte.

      *4.    Manager/Supervisor Enhancement*

Next, Garcia-Duarte and Gilberto argue that the district court erred by applying the manager/supervisor enhancement. The Sentencing Guidelines provide that courts should consider the following factors in determining whether a person is a manager/supervisor: "the exercise of decision making authority, the

No. 10-50970

nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others." U.S.S.G. § 3B1.1(b) cmt. 4.

### a.    Garcia-Duarte

The evidence at trial established that Garcia-Duarte was a manager/supervisor, as he was one of the conspirators who hired and paid the scouts, instructed Aviles on how to purchase a truck, and organized a stash house.  Thus, the district court did not clearly err in finding that Garcia-Duarte was a manager or supervisor.

### b.    Gilberto

The district court also did not clearly err in applying the manager/supervisor enhancement to Gilberto.  The PSR indicates that Gilberto served as a scout for the conspiracy; he allowed Aviles to stay at his house on one occasion; he instructed Rosalinda to scout for the conspiracy; and he received money for his role in the conspiracy.  Additionally, the Government proffered documents to the district court showing that Gilberto received over $10,000 in Western Union transfers, some of which he wired back out to other countries, which indicates he was more than just a low-level player in the conspiracy.[6]  As

---

[6] Although there is no evidence in the PSR that Gilberto sent money back out to other countries, he failed to object to this lack of evidence during the sentencing proceeding.  Even if he had, as evidenced by the Government's 28(j) letter filed with this court after oral argument, the Government offered a document at trial showing that Gilberto did, in fact, send money abroad.  Although this evidence was not admitted, we have previously held that "[t]he district court is free to consider all relevant evidence – even inadmissible evidence – as long as the evidence relied upon has sufficient indicia of reliability to support its probable accuracy." *United States v. Patterson*, 962 F.2d 409, 415 (5th Cir. 1992) (internal citation and quotation marks omitted).  This evidence was provided by a records custodian from Western Union, giving it sufficient indicia of reliability for the district court to rely on it.

No. 10-50970

the district court noted, "[s]couts don't receive $10,000 in wired money and then send it back out." Thus, we conclude that the district court did not clearly err in applying the manager/supervisor enhancement to Gilberto.

### 5. *Substantive Unreasonableness*

Finally, both Garcia-Duarte and Gilberto argue that their sentences are substantively unreasonable.

#### a. Garcia-Duarte

Garcia-Duarte objected to the reasonableness of his sentence. The Guidelines range was calculated to be 97 to 121 months, and the statutory maximum was 10 years (or 120 months). The district court sentenced Garcia-Duarte to 108 months in prison, which was within the Guidelines range. We have held that a sentence is presumed reasonable if it is within the Guidelines range. *United States v. Camero-Renobato*, 670 F.3d 633, 636 (5th Cir. 2012) (per curiam). "A defendant's disagreement with the propriety of his sentence does not suffice to rebut the presumption of reasonableness that attaches to a within-guidelines sentence." *Id.* Garcia-Duarte argues that his sentence was disproportionately harsh compared to the sentences of other members of the conspiracy and considering that he did not use a weapon or threaten anyone with harm. Garcia-Duarte made these same arguments to the trial court. The district court considered the 18 U.S.C. § 3553(a) factors and explained that this sentence was warranted, irrespective of the Guidelines, because Garcia-Duarte was "a very integral part of a very extensive conspiracy that treated illegal aliens like chattel, that made money off of them and kept them locked away." The district court also explained that "the only reason" Garcia-Duarte did not receive a higher sentence was so that his sentence was the same as Gilberto's sentence, a member of the conspiracy of equal stature. Considering the totality of the circumstances, Garcia-Duarte has not shown sufficient reason for this

court to disturb his Guidelines sentence. *See United States v. Conn*, 657 F.3d 280, 286 (5th Cir. 2011). The district judge did not abuse his discretion by sentencing Garcia-Duarte to a within-Guidelines sentence of 108 months.

> b.     Gilberto

Gilberto did not object to the reasonableness of his sentence; therefore, this court's review is for plain error. *See United States v. Peltier*, 505 F.3d 389, 391-92 (5th Cir. 2007). The Guidelines range was 78 to 97 months after the district judge granted some of Gilberto's objections, and the district judge chose to upwardly depart to 108 months. The district court explained that Gilberto "found a way to make money off of a lot of people, off of their misery and wanting to come to the United States illegally . . . . And the nature and the circumstances of this case are so heinous that I don't think that this guideline range is adequate for you." Thus, "based on the seriousness of the offense and the nature and circumstances of this case this Court is going to impose a non-guideline sentence in this particular case. The need to impose a just sentence as well is part of it and to promote respect for the law." Gilberto argues that the upward departure was based on factors that were already considered in the Guidelines calculations, and the district court did not give an adequate justification for departing upward that was independent of factors already considered.

"A sentencing court does not abuse its discretion in deciding to upwardly depart when its reasons for doing so (1) advance the objectives set forth in 18 U.S.C. § 3553(a)(2); (2) are authorized by 18 U.S.C. § 3553(b); and (3) are justified by the facts of the case." *United States v. Saldana*, 427 F.3d 298, 310 (5th Cir. 2005). In *Saldana*, the appellant argued that the Guidelines had already taken into account certain information, and the district court could not upwardly depart on that basis. *Id.* However, the court noted that the district court did not err in upwardly departing because the evidence at trial and in the

PSR established that the defendant's "behavior caused greater aggravation and harm than the typical defendant sentenced under" that particular Guidelines section. *Id*. at 312. The district court provided a similar rationale in this case, noting that the "nature and circumstances are . . . heinous" and the sentence was warranted because of "[t]he need to impose a just sentence . . . and to promote respect for the law." We therefore conclude that his above-Guidelines sentence was not substantively unreasonable under a plain error standard of review, and we affirm Gilberto's sentence.

AFFIRMED.