# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

July 11, 2023

Lyle W. Cayce
Clerk

———————

No. 22-50285
CONSOLIDATED WITH
No. 22-50286

———————

UNITED STATES OF AMERICA,

*Plaintiff—Appellee*,

*versus*

ROBERTO BUENDIA,

*Defendant—Appellant*.

———————————————————

Appeals from the United States District Court
for the Western District of Texas
USDC Nos. 2:20-CR-1354-1,
2:20-CR-1435-1

———————————————————

Before HIGGINBOTHAM, GRAVES, and DOUGLAS, *Circuit Judges*.
JAMES E. GRAVES, JR., *Circuit Judge*:

Roberto Buendia pled guilty to conspiring to transport and transporting undocumented immigrants resulting in serious bodily injury and death. He appeals a two-level sentencing enhancement under U.S.S.G. § 2L1.1(b)(8)(A) for involuntarily detaining a migrant through threat or coercion. Finding no plain error in the application of the enhancement, we AFFIRM.

## I. Background

We recite the following facts from Buendia's presentence report ("PSR") and the factual basis discussed at his plea hearing. On May 16, 2020, Buendia drove his Buick LaCrosse to an area north of Laredo, Texas to pick up two migrants who had illegally crossed the border. A border patrol agent was notified that a gold Buick LaCrosse had been seen picking up two suspected illegal immigrants in that area. The agent spotted Buendia's vehicle and started following him on U.S. Highway 83. After the agent activated his emergency lights to conduct an immigration inspection, Buendia accelerated and continued traveling north on the highway. The agent requested aerial assistance and continued to pursue Buendia for some time. When they reached a red light at the intersection of FM 190 and U.S. Highway 83 in Asherton, Texas, Buendia was traveling at a high rate of speed. Buendia ran the light and broadsided a car that was crossing the intersection. Buendia's car then struck a utility pole, ripped in two, and Buendia and both passengers were ejected from the vehicle. One passenger, A.M.A., died at the scene from his injuries. The other passenger, L.G.G.G., sustained serious injuries and had to be placed in a medically induced coma after he was airlifted to a hospital. Buendia also sustained serious injuries and had to be placed in a medically induced coma.

About a month later, Homeland Security Investigators interviewed L.G.G.G. at the hospital. L.G.G.G. said he paid a man named Gordo $2,500 to be smuggled into the United States. After crossing the border on foot with five others, the group separated when they were chased by border patrol agents. L.G.G.G. stayed with A.M.A., and they were picked up by Buendia. Once they got in his car, Buendia told them to get in the back cargo area and keep their heads down. Buendia also instructed them to get out of the car and run if they got pulled over by law enforcement. Once Buendia was being

2

22-50285
c/w No. 22-50286

chased by the border patrol agent, L.G.G.G. told Buendia to stop, but Buendia told him to shut up and stay quiet.

Buendia was charged with conspiring to transport and transporting undocumented immigrants resulting in death and conspiring to transport and transporting undocumented immigrants resulting in serious bodily injury. After Buendia pled guilty, the probation officer prepared his PSR and calculated his offense level at 27. His offense level included enhancements for intentionally or recklessly creating a substantial risk of death or serious bodily injury and for the death of A.M.A. It also included a two-level enhancement for involuntarily detaining a migrant through threat or coercion. This enhancement was supported by the following facts: "As reflected in the offense conduct, [L.G.G.G.] stated that he told Buendia to stop the vehicle. However, Buendia told him to shut up and stay quiet." Buendia did not object to the enhancement or its factual basis. The district court adopted the PSR without change. At sentencing, the district court found the advisory Guidelines range of 87-108 months inadequate and varied upward to a 144-month sentence. Buendia timely appealed the application of the two-level enhancement.[1]

## II. Standard of Review

We ordinarily review the district court's interpretation or application of the Guidelines *de novo* and its factual findings for clear error. *United States v. Cisneros-Gutierrez*, 517 F.3d 751, 764 (5th Cir. 2008). However, as Buendia concedes, we review for plain error since he did not object to the sentencing

---

[1] Buendia also appealed the revocation of his supervised release in Case No. 22-50286. We granted his motion to consolidate the appeals, but he has abandoned any challenge to the revocation by failing to raise it in his brief. *Cinel v. Connick*, 15 F.3d 1338, 1345 (5th Cir. 1994) ("An appellant abandons all issues not raised and argued in its *initial* brief on appeal." (citation omitted)).

3

enhancement below. "To establish plain error, [the defendant] is required to show that (1) there was error, (2) the error was plain, (3) the error affected his substantial rights, and (4) the error seriously affected the fairness, integrity or public reputation of judicial proceedings." *United States v. Redd*, 562 F.3d 309, 314 (5th Cir. 2009) (internal quotation marks and citation omitted).

## III. Discussion

### a. The § 2L1.1(b)(8)(A) Enhancement

The pertinent two-level sentencing enhancement applies "[i]f an alien was involuntarily detained through coercion or threat, or in connection with a demand for payment, (i) after the alien was smuggled into the United States; or (ii) while the alien was transported or harbored in the United States." U.S.S.G. § 2L1.1(b)(8)(A).

To begin, the PSR recounts that Buendia continued to drive after L.G.G.G. told him to stop the car, and Buendia did not contest that factual finding before the district court and does not contest it on appeal. Buendia conceded at oral argument that L.G.G.G. was involuntarily detained, so the only question is whether he was detained *through coercion or threat*. *Id.*

The Guidelines do not define coercion or threat as they are used in this enhancement. When terms in Guidelines are not defined, "we must give them their ordinary meaning." *United States v. Lyckman*, 235 F.3d 234, 238 (5th Cir. 2000); *see also United States v. Herrera*, 647 F.3d 172, 178-79 & n.5 (5th Cir. 2011) (defining "coerce" in the comments to U.S.S.G. § 2L1.2 by looking to definitions in dictionaries, case law, and state statutes); *United States v. Andres*, 666 F. App'x 621, 623–24 (9th Cir. 2016) (unpublished memorandum op.) (adopting dictionary definitions for "coercion" and "threat" in § 2L1.1(b)(8)(A)). Accordingly, we recite the following relevant definitions for these terms:

4

22-50285
c/w No. 22-50286

*Coercion*

- "Compulsion of a free agent by physical, moral, or economic force or threat of physical force." *Coercion*, BLACK'S LAW DICTIONARY (11th ed. 2019).

- "Constraint, restraint, compulsion; the application of force to control the action of a voluntary agent." *Coercion*, THE OXFORD ENGLISH DICTIONARY (online ed. 2023).

*Threat*

- "A communicated intent to inflict harm or loss on another or on another's property, esp. one that might diminish a person's freedom to act voluntarily or with lawful consent; a declaration, express or implied, of an intent to inflict loss or pain on another." *Threat*, BLACK'S LAW DICTIONARY (11th ed. 2019).

- "A denunciation to a person of ill to befall him; *esp.* a declaration of hostile determination or of loss, pain, punishment, or damage to be inflicted in retribution for or conditionally upon some course." *Threat*, THE OXFORD ENGLISH DICTIONARY (online ed. 2023).

Consistent with these definitions, the enhancement clearly applies when violence or threats of violence are conditioned on a migrant's attempt to leave. *See, e.g.*, *United States v. Rocha-Guajardo*, 772 F. App'x 229, 230 (5th Cir. 2019) (unpublished) (per curiam) (affirming § 2L1.1(b)(8)(A) enhancement where defendant brandished a firearm in the stash house, pistol whipped a migrant, and kicked and punched two migrants who attempted to escape). Outside of physical violence or threatened physical violence, we have also affirmed the application of the enhancement where a smuggler boarded up and padlocked the exits of a stash house "from the outside to prevent [the migrants] inside from escaping." *United States v. DeLeon*, 484 F. App'x 920, 934 (5th Cir. 2012) (unpublished) (per curiam).

Relying on the above-listed definitions, Buendia claims his conduct did not amount to a threat because he did not express, explicitly or implicitly, an intention to inflict injury or loss upon L.G.G.G. The Government

responds that "it is the words and the undisputed facts that Buendia was driving in a dangerous and erratic manner and refused to slow down that created a threat to the lives of his alien passengers." It argues that focusing only on Buendia's words and not his conduct is "like focusing on the wording of 'sit down and shut up' when a hypothetical defendant is pointing a gun; it is not merely the words that carry the threat." But there is a clear distinction between Buendia's erratic driving and pointing a gun at someone. Pointing a gun at someone while commanding them to do something communicates an intent to cause harm if the person does not comply with the command. Here, Buendia was not threatening to hurt L.G.G.G. by driving erratically if he did not comply with his command to "shut up"—he was already driving erratically because he was attempting to evade the border patrol agent. Buendia did not communicate any intent to inflict harm if L.G.G.G. failed to heed his command, so his conduct did not amount to a threat.

Buendia also argues his conduct did not amount to coercion. At first glance, Buendia's continued driving appears similar to the smuggler's actions in *DeLeon* because it had the effect of keeping L.G.G.G. in the car. 484 F. App'x at 934. However, in *DeLeon*, the smuggler locked the exits from the outside in order to prevent the migrants inside from escaping. *Id.* Thus, the enhancement was properly applied there because the smuggler acted "*to control* the action of a voluntary agent." *Coercion*, The Oxford English Dictionary (online ed. 2023) (emphasis added). Here, Buendia did not continue to drive *in order to* prevent L.G.G.G. from escaping—he continued to drive in order to avoid apprehension. That Buendia's continued driving was not for the purpose of detaining L.G.G.G. is buttressed by his prior instruction to L.G.G.G. and A.M.A. to exit the vehicle and run should they be pulled over by law enforcement.

L.G.G.G. was involuntarily detained, but he was not involuntarily detained through threat or coercion. The district court erred by applying this enhancement to Buendia's conduct.

### b. Plain Error

We have found error, but Buendia must also show the error was plain since he did not object. *Redd*, 562 F.3d at 313. In his brief, Buendia did not point to any case law showing why the enhancement should not apply to him, and a "lack of binding authority is often dispositive in the plain-error context." *United States v. Gonzalez*, 792 F.3d 534, 538 (5th Cir. 2015). However, at oral argument, Buendia's counsel directed us to *United States v. Torres* where we found plain error based on "an uncomplicated resort to the language of the guidelines." 856 F.3d 1095, 1099 (5th Cir. 2017). In that case, the defendant was convicted of drug trafficking and money laundering. *Id.* at 1097. He later moved to reduce his sentence based on lowered ranges for drug quantity that were put in place after his sentencing. *Id.* The district court denied his motion because it concluded that the change would affect his drug trafficking range but not his money laundering range. *Id.* The defendant did not object to this conclusion. *Id.* However, this court disagreed because the defendant's money laundering range was tied to "[t]he offense level for the underlying offense from which the laundered funds were derived [the drug trafficking offense]." *Id.* at 1098-99 (quoting U.S.S.G. § 2S1.1(a)(1)). Since this court found error through a straightforward application of the language in § 2S1.1(a)(1), it found the error was also plain. *Id.* at 1099.

We find error here based on the ordinary meanings of the terms in the enhancement, but our conclusion involved the additional step of explaining how this case differed from the circumstances in *DeLeon*. 484 F. App'x at 934. Again, the smuggler's blocking of the exits in *DeLeon* could be analogized to Buendia's continued driving because both resulted in migrants

being held against their will. It was only after identifying the purpose of the application of force in each case that we were able to distinguish them. While non-precedential, *DeLeon* is relevant because "[t]here is no plain error if the legal landscape at the time showed the issue was disputed, even if, as here, the district court turns out to have been wrong." *United States v. Rodriguez-Parra*, 581 F.3d 227, 230 (5th Cir. 2009). In *Rodriguez-Parra*, we explained that the error was not plain because it required "a careful parsing of all the relevant authorities, including the sentencing guidelines and applicable decisions." *Id.* at 231. We reach a similar conclusion here: since we had to survey the relevant definitions and distinguish prior non-precedential case law, the error was not plain.

## IV. Conclusion

Buendia's claim of plain error fails at the second prong, so we need not examine the remaining prongs. The judgment is AFFIRMED.